UNITED STATES, OWNER OF THE STEAMSHIPS "CLIO," "MOOSEABEE," "FORT LOGAN," AND "MORGANZA," ET AL. *v.* CARVER ET AL., CO-PARTNERS, UNDER THE FIRM NAME OF BAKER, CARVER, AND MORRELL.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 402. Argued December 6, 1922.—Decided January 2, 1923.

1. Under the Maritime Lien and Ship Mortgage Acts, June 23, 1910, c. 373, 36 Stat. 604; June 5, 1920, c. 250, § 30, 41 Stat. 1000, 1005, no lien arises for supplies furnished a chartered vessel where the charter forbids it, and where the material-man, by reasonably diligent investigation, could have ascertained there was a charter and gained knowledge of its terms. P. 489.
2. A charter-party provided that the charterer would not " suffer nor permit to be continued any lien . . . which has or might have priority over the title and interest of the owner," and that, in any event, within fifteen days, the charterer would provide for the satisfaction or discharge of every claim that might have such priority, or cause the vessel to be discharged from such lien, in any event, within fifteen days after it was imposed. *Held,* that the charterer was under a primary obligation not to suffer any lien to be imposed. P. 489.

QUESTIONS certified by the Circuit Court of Appeals, arising upon an appeal from a judgment of the District Court, in admiralty, upholding a claim of right to a maritime lien, in a suit *in personam* brought against the United States and the receiver of a ship corporation, under the Suits in Admiralty Act.

*Mr. Norman B. Beecher,* with whom *Mr. Solicitor General Beck, Mr. Assistant Attorney General Ottinger, Mr. J. Frank Staley,* Special Assistant to the Attorney General, and *Mr. Arthur M. Boal* were on the briefs, for the United States.

Maritime liens for necessaries or supplies would not have arisen against either the Clio or Morganza had both vessels been privately owned.

The person ordering the supplies or necessaries was without authority from the owner to impose maritime liens on either the Clio or Morganza.

The fact that the order for the supplies came from a shore agent and not from the master put the supply man on inquiry as to the extent of the authority of the person giving the order to bind the vessel. His failure to make any inquiry rebuts any possible presumption of authority in the person giving the order to impose liens on the vessel.

Under the lien statutes a supply man receiving an order from a person other than the master, is put upon inquiry as to the relation of the person giving the order to the vessel. If he fails to make any inquiry he is charged with such knowledge as a reasonable inquiry would have disclosed of any lack of authority in the person giving the order to bind the vessel.

Any possible presumption of authority in the person ordering the supplies for the Morganza to impose a maritime lien on the vessel is rebutted by knowledge in fact in the supply man of his lack of such authority.

The United States is not liable for what would have been a maritime lien had the vessels affected been privately owned.

The United States is not liable for the personal indebtedness of the States Steamship Corporation in respect of supplies and necessaries furnished to a vessel in respect of which no maritime lien would have arisen had such vessel been privately owned.

*Mr. E. Curtis Rouse* for Carver et al.

A maritime lien arose for the supplies furnished the Clio which would have been enforceable *in rem* had that vessel been privately owned.

Whether the contracts under which the State Steamship Corporation obtained possession of the Clio and Morganza be called conditional or partial payment purchase contracts or charters, the fact remains that they were a complete and absolute demise of the vessels. The corporation was the owner *pro hac vice* of the vessels at the time. That the corporation was in lawful possession has never been questioned.

The person ordering the supplies for these vessels was the person to whom the management of the vessels at the port of supply had been intrusted.

The certificate states that these libelants had no notice or knowledge of any charter or contract under which the State Steamship Corporation held the Clio, or that they were other than owners, and that they had no cause to suspect the existence of one.

The paragraphs of the Maritime Lien Statute of 1910 (36 Stat. 604), material to the consideration of the question here presented, are in §§ 1 and 2.

Since that statute, demised vessels have uniformly been held liable *in rem,* and subject to liens for supplies furnished on the order of the representatives named in the statute, although appointed by charterers or conditional vendees in possession under such contracts and clauses as exist here. The various Circuit Courts have been uniform in their construction of this statute. *The Oceana,* 244 Fed. 80 (certiorari denied 245 U. S. 656); *The Yankee,* 233 Fed. 919, 926 (certiorari denied 243 U. S. 649); *The Penn,* 276 Fed. 118; *The St. Johns,* 273 Fed. 1005; 277 Fed. 1020 (certiorari granted 257 U. S. 626); *The Ascutney,* 278 Fed. 991; *The Portland,* 273 Fed. 401; *The South Coast,* 251 U. S. 519; *The Cratheus,* 263 Fed. 693.

The appellant, relying on a forced construction of certain language used in the decision in *Piedmont Coal Co.* v. *Seaboard Fisheries Co.,* 254 U. S. 1, urges here, exactly as was unsuccessfully urged in *The Oceana,* that,

in the case where a charter exists, the Lien Statute of 1910 does not apply, and that the rule of *The Valencia,* 165 U. S. 264, still obtains, and that a supplyman cannot obtain a lien where a charterer ordered the supplies.

Both of the objections pointed out by the Court in *The Valencia,* have been expressly eliminated by the Lien Statute of 1910 (and also that of 1920). First, by dispensing with the so-called home port rule and the presumption of dealing on the credit of the owner only and, secondly, by expressly giving the presumption of a lien for supplies upon the order of any one of a certain class of persons, whether appointed by a charterer, or agreed purchaser, or other owner *pro hac vice.* This did away with the requirement for the express contract for lien referred to in that decision.

The statute was passed directly after the *Valencia* decision and obviously to modify its harshness and yet render practical the protection of the lien for maritime supplies. This interpretation of the decision is supported by *Piedmont Coal Case,* 254 U. S. 1, and *The South Coast,* 251 U. S. 519.

There is nothing in the decision supporting the argument made by the appellant here that the mere fact of the existence of a charter prevents a supplyman procuring a lien and puts him on notice. On the contrary, the case supports the argument sustained in *The Oceana* and in the lower court in this case, that there must be some condition or circumstance brought home to the supplyman which puts him on inquiry or notice of the existence of a restriction which would prevent his acquiring a lien. This is made clear by the concluding paragraph of the *Valencia* opinion.

The rule urged by the appellant would bring back a worse chaos than ever existed before the statute. It would nullify in fact the entire point and force of the

statute. It would require that every supplyman, on re-
ceiving an order, would have to initiate an inquiry, not as
to the home port, it is true, but as to whether he was
dealing with a representative of a charterer, vendee or
other owner *pro hac vice*. If he found that he was deal-
ing with other than an owner personally, he would be
obliged, at his peril, to inquire the exact authority of
that person to order for the ship, and the fact that the
person was in open, visible control of the management
of the vessel at the port of supply or said he was the
owner would be immaterial. He would be obliged to go
to the original charter or contract or letter of appoint-
ment and record title. He could not rely on the state-
ment of the purchaser or of the charterer. It is not al-
ways true that these charters or contracts are readily
available. Therefore, the express words of the statute
that these respective officers or agents, when appointed
by a charterer, agreed purchaser in possession, or owner
*pro hac vice,* are to have the same authority as when ap-
pointed by the owner, or as the owner himself, would be
expressly nullified. It seems too clear for extended argu-
ment that this could not have been the intention of the
framers of the statute.

It is urged by the appellant that this difficulty would
be cured by insisting on the order being signed by the
master. The weakness of this lies in the fact that usually
these charters are bareboat form, where the master is
the appointee of the charterer, or agreed purchaser in
possession. He has no greater authority than they, and,
being the appointee of the charterer or vendee, his au-
thority must necessarily be subject to the same inquiry.
The master, as master, has no inherent power, in absence
of the statute, to pledge the credit of the vessel. He
never could do it in the home port, or where the owner
was present. He could not do it in a foreign port unless
necessity was shown, and also he had no funds and the

owner had no credit. But by § 2 of the statute he is now given that power and is placed in the same class as managing owner, ship's husband or any other person such as the marine or port superintendent, or captain, to whom the management of the vessel, at the port of supply, is entrusted. This is the force of the decision in *The South Coast,* 251 U. S. 519, as applied to the present case.

The charter clearly contemplates that a lien may, in the course of operations, be incurred, and that this lien may be continued to exist for a limited time; that the vessel may be arrested to enforce such lien and may continue under such arrest for a limited time. It is practically the same clause which this Court said in *The South Coast,* 251 U. S. 519, was not a prohibition; *The Oceana, supra; The Yankee, supra.* The lien was not denied, in the *Valencia Case,* because of the language of the clause, but because of the home port rule.

A maritime lien arose for the supplies furnished the Morganza herein which would have been enforceable *in rem* had that vessel been privately owned.

There being a right to a lien *in rem* against the ships, had they been privately owned, this suit was maintainable under the Suits in Admiralty Act.

Mr. Justice Holmes delivered the opinion of the Court.

This is a libel *in personam* against the United States and the receiver of State Steamship Corporation, a company of the State of Delaware, bankrupt, to charge the United States for supplies furnished to the steamships Clio and Morganza. Act of March 9, 1920, c. 95, 41 Stat. 525. The United States owned the vessels, but they were in the possession of the corporation under charters by which the corporation was to pay all costs and expenses incident to the use and operation of the vessels, and " will not suffer nor permit to be continued any lien, encum-

brance, or charge which has or might have priority over the title and interest of the owner in said vessel." It was stipulated further that in any event within fifteen. days the charterer would make adequate provision for the satisfaction or discharge of every. claim that might have priority over the title, &c., or would cause such vessel to be discharged from such lien in any event within fifteen days after it was imposed. Supplies or necessities were furnished to the Clio upon the orders of the corporation's port captain who was charged with the duty of procuring them. The libelants did not know any facts tending to show that the corporation did not own the vessel, and so far as appears made no inquiry or effort to ascertain what the facts might be. The case of the Morganza is similar except that before furnishing some of the supplies the libelants' agent who dealt with the corporation knew facts putting the libelants upon inquiry but preferred to avoid making it. The liability of the corporation is admitted. That of the vessels is asserted under the Act of June 23, 1910, c. 373, 36 Stat. 604, and the Ship Mortgage Act, being § 30 of the Merchant Marine Act, 1920; Act of June 5, 1920, c. 250, § 30, subsections P. Q. & R., 41 Stat. 988, 1000, 1005.

The questions certified are whether a maritime lien would have arisen against (1) the Clio or (2) the Morganza, if they had been privately owned; (3) if yes, whether the United States is liable for the amount of what would have been the lien; and (4) whether the United States is liable for the personal indebtedness of the State Steamship Corporation for supplies in respect of which no maritime lien would have arisen if the vessel had been privately owned.

We take up first questions 1 and 2. The Act of 1910, by which the transactions with the Clio were governed, after enlarging the right to a maritime lien and providing who shall be presumed to have authority for the owner to

procure supplies for the vessel, qualifies the whole in § 3 as follows: " but nothing in this Act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." We regard these words as too plain for argument. They do not allow the material-man to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the material-man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both. The Ship Mortgage Act of 1920 repeats the words of the Act of 1910.

But it is said that the charter-party if known would have shown that the master at least, if not the agent who ordered the supplies, had authority to impose a lien, since the charter-party contemplated the possibility of one being created and provided for its removal. *The South Coast,* 251 U. S. 519, is cited as establishing the position. But there is a sufficient difference in the language employed there and here to bring about a different result. In *The South Coast* the contract went no farther than to agree to discharge liens within a month. Here the primary undertaking was that " the charterers will not suffer nor permit to be continued any lien," &c. We read this as meaning will not suffer any lien nor permit the same to be continued. Naturally there are provisions for the removal of the lien if in spite of the primary undertaking one is imposed or claimed. But the primary undertaking

is that a lien shall not be imposed. We are of opinion that the libelants got no lien upon the Clio, and *a fortiori* that the Morganza was free. The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times. Therefore it is unnecessary to consider whether the libelants' argument is supported by the decisions to which they refer. *The Yankee, sub nom. Rivers & Harbors Improvement Co.* v. *Latta,* 243 U. S. 649. *The Oceana, sub nom. Morse Dry Dock & Repair Co.* v. *Conron Brothers Co.,* 245 U. S. 656.

As the libelant disclaim the contention that the United States is liable even if the vessels would not have been subject to a lien it is unnecessary to answer the fourth question. It is enough that the first and second are answered, No.

*Answer to questions 1 and 2, No.*