MORSE DRY DOCK & REPAIR CO. v. UNITED STATES. THE PRINCESS MATOIKA. THE POCAHONTAS. THE SUSQUEHANNA. THE POTOMAC. THE AMERICA.*

(District Court, S. D. New York. January 14, 1924.)

1. Maritime liens ⬦⇒10, 11—That work cost 20 per cent. of vessels' value held insufficient to show work was "reconstruction," as distinguished from "repairs."

Where the only evidence as to the nature of work done on vessels to fit them for the passenger trade was that the cost was about 20 per cent. of their value, this was insufficient to show that the work was "reconstruction," as distinguished from "repairs," so as to make Maritime Liens Act June 23, 1910 (Comp. St. §§ 7783–7787), inapplicable.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reconstruct—Reconstruction; Repair—Repairs.]

2. Maritime liens ⬦⇒4—Ownership of vessel at time libel in personam filed held immaterial.

Where maritime liens, enforceable in personam against the United States, arose when the work was complete, the fact that the United States no longer owned the vessel when the libel was filed was immaterial.

3. Admiralty ⬦⇒32—United States cannot be libeled in personam, where vessel not within district.

A suit cannot be maintained against the United States in personam on a claim in rem, unless the vessel of the United States was, at the time suit was brought, within the district.

4. Admiralty ⬦⇒32—Stipulation that vessel was within district in which libel in personam filed held to satisfy statute.

A stipulation that the vessel with respect to which a libel in personam was filed against the United States was within the district in which the libel was filed was sufficient to support the libel, under Suits in Admiralty Act, § 2 (Comp. St. Ann. Supp. 1923, § 1251¼a).

5. Maritime liens ⬦⇒30—Failure of repair or supply man to make inquiry held not prejudicial, where right of charterer or conditional vendee to create liens exists.

If the agreement under which charterer or conditional vendee is in possession of a vessel permits the creation of liens by him, a repair or supply man will not be prejudiced by failure to make inquiry as to its terms, because inquiry will only disclose that fact.

6. Maritime liens ⬦⇒30—Affirmative duty on person furnishing supplies to inquire into authority of person ordering supplies.

Under Maritime Liens Act June 23, 1910, § 3 (Comp. St. § 7785), an affirmative duty rests on persons furnishing supplies, on the order of the person in possession of a vessel to make inquiry as to his authority to make contracts binding on the vessel.

7. Maritime liens ⬦⇒30—Not due diligence for repair man to rely on statements by one in possession of vessel. ·

It was not due diligence, satisfying the requirement of Maritime Liens Act June 23, 1910, § 3 (Comp. St. § 7785), for a repairman, seeking to impose a lien, to rely on the statements of a person in possession of the vessel as to the terms of the contract with the United States under which he had possession, where the Shipping Board was in the habit of answering inquiries, and the contract was in a common form, and the disposition of government vessels a matter of commercial and public interest.

8. Maritime liens ⬦⇒65—Evidence held insufficient to show due diligence by repair man in ascertaining whether charterer had authority to bind vessels.

On libel in personam against the United States for reconditioning vessels on orders of the charterer, who had the option to purchase the ves-

sels, evidence *held* insufficient to show that libelant used reasonable diligence to ascertain whether charterer had authority to bind the vessels.

**9. Estoppel ⬅62(2)—False statements by charterer of vessels belonging to the United States held not to estop United States.**

That a repair man, who repaired vessels belonging to the United States on orders of the charterer, was misinformed by charterer, or misunderstood what was said, as to charterer's right, *held* not to estop the United States from asserting its rights.

In Admiralty. Libels in personam by the Morse Dry Dock & Repair Company against the United States as owner of the Princess Matoika, the Pocahontas, the Susquehanna, the Potomac, and the America. Libels dismissed.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown and Harrington Putnam, both of New York City), for libelant.

William Hayward, U. S. Atty., and Walter Schaffner, both of New York City, for the United States.

WARD, Circuit Judge. May 28, 1920, the government and the United States Mail Steamship Company (hereafter called the steamship company) entered into an agreement by which the government contracted to deliver to the steamship company within one year certain named steamers which had been used as army transports. The agreement provided that each steamer was to be delivered under the terms of a form of charter annexed, which required the steamship company to recondition the steamer at its own expense and to operate it as owner pro hac vice for the term of five years, with an option to purchase. If the option were exercised, the cost of reconditioning, with a deduction of $7\frac{1}{2}$ per cent. for annual depreciation, was to come out of the purchase price; if it were not exercised, the government was to return the same amount in cash at the termination of the charter. The government's object was to establish the American merchant marine as far as possible in regular passenger business, and the steamship company agreed to employ the vessel in one or more of the following services: New York-Queenstown-Cherbourg-Bremen, returning via Cherbourg-Southampton; New York-Dover-Boulogne-Danzig; Boston-Queenstown-Cherbourg-Bremen, returning via Southampton-Cherbourg; also Mediterranean ports.

Among the steamers named were those involved in this suit, and the following table shows the date of delivery, the date of completion of the reconditioning, and the date of the charter sale agreement:

| Steamer. | Date of Delivery. | Date of Completion of Reconditioning. | Date of Charter Sale Agreement. |
|---|---|---|---|
| Princess Matoika | December 21, 1920 | June 14, 1921 | April 22, 1920 |
| Pocahontas | January 17, 1921 | May 22, 1921 | January 17, 1921 |
| Susquehanna | April 4, 1921 | June 6, 1921 | June 9, 1920 (Antigone) |
| Potomac | April 26, 1921 | August 2, 1921 | December 11, 1920 |
| America | April 5, 1921 | August 26, 1921 | June 7, 1920 |

The United States retook the steamers from the steamship company some time in August, 1921. The Morse Dry Dock Company; which

contracted with the steamship company for the reconditioning, originally filed a libel in the United States District Court for the Eastern District of New York against the five steamers. Subsequently it filed separate libels against the Princess Matoika, the America, the Pocahontas, and the Susquehanna in the United States District Court for the District of New Jersey, and against the Potomac in the District Court of Connecticut. These five libels were removed, in accordance with the provisions of section 2 of the Suits in Admiralty of March 9, 1920, 41 Stat. 525, c. 95 (Comp. St. Ann. Supp. 1923, § 1251¼a), to the District Court of the United States for the Southern District of New York, were consolidated by an order of that court, and are now tried together. The libelant, the Morse Company, made oral contracts with the steamship company for reconditioning all these steamers at cost plus, except the America, for which a written contract was executed.

[1] The United States contends in the first place that the Maritime Liens Act of June 23, 1910, 36 Stat. 604, c. 673 (Comp. St. §§ 7783–7787), does not apply, because the reconditioning was not "repairs" within the meaning of the act, but "reconstruction," and relies for this upon the decision of the Circuit Court of Appeals of this circuit in The Susquehanna, 267 Fed. 811. The only evidence as to the nature of the work done to the vessels to fit them for the passenger trade is that the cost was about 20 per cent. of their value. This is not enough for me to say that the work done was reconstruction, as distinguished from repairs, especially in view of the decision of the Supreme Court in New Bedford Dry Dock Co. v. Purdy, 258 U. S. 96, 42 Sup. Ct. 243, 66 L. Ed. 482. This defense is accordingly overruled.

[2, 3] A special defense was made by amendment to the answer in the case of the steamship Pocahontas, viz. that she was not owned by the United States at the time of the filing of the libel or at any time thereafter, and that she was not at the time of the filing of the libel within the territorial limits of the United States, or of any of its waters. I think it makes no difference, so far as the United States is concerned, whether it owned the vessel at the time of suit brought or not. A suit in rem could then have been maintained against a vessel privately owned, and it follows that a libel in personam could be brought against the United States. The lien, if any, arose at the time the work was done, and ownership at the time of suit brought would seem to be quite immaterial. I have considered this question more at length in the case of Dir. Gen. v. The Tug Nonpareil, 1924 A. M. C. 312. But that the vessel must have been in the District of New Jersey at the time of suit brought follows from Blamberg v. United States, 260 U. S. 452, 43 Sup. Ct. 179, 67 L. Ed. 346, 1923 A. M. C. 50, in which the court held that a suit could not be maintained against the United States in personam upon a claim in rem, if the vessel were at the time of suit brought in foreign waters. Mr. Chief Justice Taft said at page 459 (43 Sup. Ct. 181):

"All we hold here is that the District Court was right in construing the second section of the Suits in Admiralty Act not to authorize a suit in per-

sonam against the United States as a substitute for a libel in rem when the United States vessel is not in a port of the United States or of one of her possessions."

The Circuit Court of Appeals of this circuit has held to the same effect in The Isonomia, 285 Fed. 516, 1923 A. M. C. 132.

[4] The claim against the Pocahontas is in rem, and only in rem, because no personal responsibility upon the part of the United States can be pretended. It having been stipulated " * * * that at the time each of the other libels (i. e., other than the original libel filed in the Eastern district of New York) which have been consolidated herein was filed, that the vessel with respect to which that libel was filed was within the district in which such libel was filed," the conditions of the act are satisfied.

[5, 6] The Maritime Liens Act was construed liberally in favor of supply and repair men by the lower federal courts generally, notably in this circuit in the case of The Oceana, 244 Fed. 80, 156 C. C. A. 508. It was held in it that the conditional bill of sale involved did not permit liens to be filed for repairs or supplies ordered by the conditional vendee, but that there was no duty upon the part of the creditors, who furnished repairs or supplies on its order, to make inquiry, e. g., examining the records of the custom house, etc.; and that, on the contrary, it lay upon the owner, who knew that repairs and supplies were being furnished, "to show some fact or circumstance which would have put these libelants on inquiry," under section 3 of the act (Comp. St. § 7785), which reads:

"Sec. 3. That the officers and agent of a vessel specified in section two shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel, but nothing in this Act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel. or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

If the agreement under which the charterer or conditional vendee is in possession permits the creation of liens by him, the repair or supply man will not be prejudiced by failure to make inquiry as to its terms, because inquiry will only disclose that fact, as the Supreme Court held in The South Coast, 251 U. S. 519, 40 Sup. Ct. 233, 64 L. Ed. 386. But in the late case of United States v. Carver et al., 260 U. S. 482, 43 Sup. Ct. 181, 67 L. Ed. 361, 1923 A. M. C. 47, which I infer was also a charter sale contract, the same court held, Mr. Justice Holmes writing, that an affirmative duty under section 3 of the act lay upon persons furnishing supplies on the order of a party in possession of a vessel to make inquiry as to his authority to enter into contracts binding the vessel. He said in reference to section 3:

"We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he

was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both. The Ship Mortgage Act of 1920 repeats the words of the act of 1910."

Now the language of the charters in the instant case is the same as that construed in the Carver Case, and it follows that the libelant would have learned by the least inquiry of the Shipping Board of the steamship company's lack of authority to bind the vessels, and that it was itself under the duty of reconditioning them at its own expense.

[7] Therefore my decision turns upon the question whether the libelant, by the exercise of reasonable diligence, could have ascertained that the steamship company was without authority to bind these vessels for the cost of reconditioning. It is true that the libelant is not resting on a mere presumption. Morse, who was treasurer, secretary, and general manager of the libelant, says that Koester, vice président of the steamship company, told him that it had bought the vessels, and that the United States had agreed to recondition them at its own expense. It is clear that both these statements were untrue, but I assume that there was no intention of making any false statement. It was quite natural for the steamship company's officers to speak of these vessels, of which the company was owner pro hac vice, and which were to run regularly in its line, as "its vessels," and, because the United States was ultimately to pay for the reconditioning, to say, speaking loosely, that it was being done at its expense. But I cannot say it is due diligence, satisfying the requirements of section 3 of the act, for a repair man to rely upon the statements of a person in possession as to the terms of the contract under which he is so possessed, without more. This is not only because such persons may be under a temptation to make misleading statements for the purpose of getting the repairs or supplies they need, but also because of statements loosely made, as I have assumed Koester's were. Morse admits that the charter sales of vessels belonging to the United States were common at that time, and that the disposition of these particular vessels of the largest size had excited great interest in commercial circles and in the public press. The evidence also is that the Shipping Board was in the habit of answering fully inquiries made by persons entitled to information as to its vessel contracts.

[8] Morse relies, in addition, upon what took place at a meeting of the Shipping Board at Washington January 14, 1921, which he attended, as confirming Koester's statement to him. At that time the Princess Matoika was in the libelant's yard, being reconditioned for cost plus. The meeting was called to give the Todd Dry Dock Company a hearing on its objection to the reconditioning of these particular vessels at cost plus, instead of upon specifications and competitive bidding, which it contended was the cheaper method. It occupied in all but 40 minutes. There was a great deal said quite consistent with the government's being presently liable for the cost of reconditioning, but it was also consistent with its not being presently liable, because its actual interest was its obligation under the charter sales to de-

duct the cost of reconditioning by the steamship company from the purchase price, if the option were exercised, or in cash at the termination of the charter, if the option to purchase were not exercised. This was a sufficient reason why the United States should supervise and inspect the work and keep checkers on it and audit the bills rendered; and some things were also said showing that the steamship company was charterer only. Mr. Morse says he did not hear anything that was said about the charter, or about the interest of the government to get charter hire sooner by the cost plus method of reconditioning, and supposed from what he did hear that it was paying for the expense of it, as Koester had told him it had agreed to do. I think he took the risk of relying upon what he did or did not hear at this meeting as confirming Koester's statements, instead of making direct inquiry of the Shipping Board as to the terms of its contract with the steamship company. This is what I understand the Supreme Court holds in the case of United States·v. Carver et al., supra, it is necessary for a repair or supply man to do.

Indeed, when Morse saw it stated in the contract prepared for execution between the steamship company and his own company for reconditioning the America, dated April 7, 1921, that in an agreement between the United States and the steamship company, dated May 28, 1920, the steamer was chartered to the steamship company, which was to be itself at the expense of reconditioning her, he arranged with the Shipping Board to guarantee the payments of the steamship company or to make the payments itself. But he made no inquiry about the contract of May 28, 1920, or about the terms of reconditioning the other steamers involved in this case, although the steamship company paid for this with its own checks and his company did more work thereafter on all of them.

[9] The government did not know that Morse had been misinformed as to the contract by Koester, or had misunderstood what he said, and nothing that it did or left undone·constitutes any estoppel against it in asserting its actual rights. The libelant is certainly unfortunate in having suffered as a shipowner under the construction of section 3 of the Maritime Liens Act in the case of The Oceana, supra, and is now suffering as a shipbuilder under the stricter construction of it in United States v. Carver, supra, but under that case I must hold that by the exercise of reasonable diligence it would have ascertained that under the charter sale agreements between the United States and the steamship company the latter was, without authority to bind the vessels for the expense of reconditioning and that notice of that fact is to be imputed to it.

The libels are dismissed.