## THE BETHLEHEM.

## THE NORTHERN WAVE.

(Circuit Court of Appeals, Third Circuit. March 4, 1925.)

Bethlehem Cases, Nos. 3228 to 3236, except No. 3235. Northern Wave Cases, Nos. 3237 to 3249, except No. 3247.

1. Maritime liens ⊜⟹30—Materialmen and repairmen held entitled to liens, where reasonable inquiry would not have disclosed contract barring liens.

Ship Mortgage Act June 5, 1920, § 30, subsec. R (Comp. St. Ann. Supp. 1923, § 8146¼pp), does not bar liens for materials or repairs furnished owner, where no inquiry was made as to owner's authority to bind vessel, if reasonable investigation would not have disclosed existence of agreement barring liens.

2. Maritime liens ⊜⟹28—Furnisher of supplies need not in every instance make investigation to extent of searching title in vessel's home port.

Ship Mortgage Act June 5, 1920, § 30, subsec. R (Comp. St. Ann. Supp. 1923, § 8146¼pp), in requiring furnisher of supplies to exercise reasonable diligence to ascertain owner's authority to bind ship, does not require him in every instance to make investigation complete in all details, even to visiting home port of vessel and searching title, in view of history of legislation.

3. Maritime liens ⊜⟹30—Mortgage prohibiting liens for materials and repairs held not discoverable by reasonable diligence.

Where no copy of mortgage prohibiting liens for materials and supplies was included among vessel's documents, as required by Ship Mortgage Act June 5, 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼jjj–8146¼rr), and search of vessel's documents would not have disclosed mortgage, which was recorded in vessel's home port, materialmen and repairmen could not by reasonable diligence have discovered existence of mortgage, and they were therefore entitled to lien for repairs and supplies.

4. Admiralty ⊜⟹90—Decrees pro confesso for unlawful amounts held final, and not subject to collateral attack.

Decrees pro confesso on libels entered for unlawful amounts in favor of ships' crews were final, and could not be collaterally attacked, but were reviewable only by appeal, or rehearing under admiralty rule 39, and possibly by bill in nature of bill of review.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Libels by the United States, as mortgagee of the Steamship Bethlehem and the Steamship Northern Wave, against the Ainsworth Coal & Iron Company and others. From final decrees of the District Court, distributing proceeds of sales of the steamships (298

F. 188, 190), libelant appeals. Decrees modified, and, as so modified, affirmed.

See, also, 286 F. 400.

George W. Coles, U. S. Atty., of Philadelphia, Pa., and William R. Fitch, of Washington, D. C., for the United States.

Howard M. Long and Willard M. Harris, both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. These appeals are from final decrees of the District Court distributing the proceeds of sales of the steamships Bethlehem and Northern Wave, and are enough alike to be considered together.

The twenty suits were instituted by libels filed by those who had supplied material, labor, repairs and necessaries to the respective steamships, by libels filed by the crews for wages, and libels filed by the United States to enforce mortgages against the ships and to collect claims for wharfage and expenses in connection with their care after they had been attached and while in the custody of the marshal. The ships were sold at separate sales and the libels now stand against the two funds, which are not sufficient to pay the claims.

The highly involved facts may for the purposes of this opinion be stated as follows:

The United States Shipping Board sold the steamships Bethlehem and Northern Wave to the West Indian Navigation Company, a Maryland corporation, for $75,000 each. Of this sum $7,500 was paid on delivery and $67,500 was later secured by a mortgage given on each ship. On October 22, 1920, the Shipping Board delivered the ships to the purchaser at Boston, giving it the requisite certificates of an agreed purchaser in possession. The Navigation Company sent the ships to Philadelphia, where they arrived on dates in November corresponding closely to the date of recording the mortgages. In that port both ships were loaded with coal, one destined for Chile and the other for Costa Rica. The new owner collected the advance freight upon the two cargoes in the sum of $34,000 respectively, and then abandoned the enterprise without paying for the necessaries supplied, materials furnished and repairs made to the ships at Boston and Philadelphia.

After the cargoes had been loaded and freights collected the United States Local Inspectors of Steam Vessels found that the ships were unseaworthy and refused certificates allowing them to proceed on their voyages.

On November 20, 1920 agreements of sale of the ships were executed as of October 22, 1920, the date the ships were delivered. The purchaser also executed mortgages against the ships covering the deferred payments which were recorded at Baltimore, Maryland, the home port, on November 20, but endorsement of the mortgages on the ships' documents was not made until January 14, 1921, nor were copies of the mortgages carried on the ships, as required by the Ship Mortgage Act of 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼jjj–8146¼rr) to give them the status of preferred mortgages. Between the date of the delivery of the ships and the date of the endorsement of the mortgages on the ships' papers, the debts for which maritime liens are here claimed were incurred.

For a while the Shipping Board to protect its mortgages, contemplated paying off the claims of the many libellants, and did pay off the wage claims of the crews. With this in view it took possession of the ships and placed skeleton crews on board, but on February 3, 1921, it returned them to the marshal. At the sale, which shortly ensued, it purchased the ships. In the meantime the wage claimants had secured decrees pro confesso on their libels, of which the Shipping Board, on paying the wages, took assignments. After the sales the court, for the purpose of distributing the proceeds, ordered the claims of all libellants referred to a commissioner, among which were the assigned decrees for the crews' wages, with the direction that he ascertain and compute the amounts due the respective libellants and petitioners "with leave to each and every one [of them] to contest the amount due to each [of them] and to submit proofs therein, and also to contest the * * * priority of the respective claims." The commissioner, regarding the wage decrees pro confesso as final, allowed them in full, thus as to one ship absorbing, and as to the other almost absorbing, all funds for distribution. On exceptions the learned trial court reversed this action of the commissioner and remanded the references, which resulted in reports by the commissioner reducing the wage claims, later approved by the decrees now here on review.

The trouble in this phase of the case arose out of a mistake admittedly made by the court in entering (in an ex parte proceeding) decrees upon the wage claims of the crews for amounts in excess of what were claimed

by the libels. This excess was for wages incurred after the ships had been arrested and were in the custody of the law. The Astoria (C. C. A.) 281 F. 621.

In the case of the Bethlehem the wages claimed by two libels—all that were legally due—amounted together to the sum of $5,112.57 while the amount allowed by the decrees pro confesso was $9,597.99, or $4,485.42 more than the filed claims of the crew. In the case of the Northern Wave the wages claimed by the libel—all that were legally due—was the sum of $2,171.84; the amount allowed by the decree pro confesso was $5,224.36, or $3,052.50 more than the filed claims, or a total of $7,537.94 which the Shipping Board concedes was, through inadvertence, improperly allowed, yet for which it is pressing to recover.

The main questions arising from the whole transaction are, first, whether the libellants for supplies and repairs used such diligence to find the agreements of purchase and the mortgages, which contained covenants denying the owner the right to incur liens upon the ships, as would entitle them to maritime liens under the Act of 1920; and, second, if they did, whether the decrees pro confesso are subject to collateral attack and to be set aside by orders of reference to a commissioner more than four months after the date of the decrees and by renewed orders of reference made about two years thereafter, there being no question of fraud or of the lack of the court's jurisdiction.

[1] The law governing the first question is that of the Clio, pronounced by the Supreme Court in United States v. Carver, 260 U. S. 482 at page 488, 43 S. Ct. 181, 67 L. Ed. 361, when interpreting provisions of the Act of 1910. (Comp. St. §§ 7783–7787) repeated in the Ship Mortgage Act of 1920, as to the presumption of the authority of certain persons, including the owner, to bind the ship for supplies and repairs which the laws raises. The court said that (by Section 3 of the Act of 1910 [Comp. St. § 7785] which is the same as subsection R of section 30 of the Act of 1920 [Comp. St. Ann. Supp. 1923, § 8146¼pp]), the Act qualifies this statutory presumption as follows:

"But nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of the charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

Continuing, the court said:

"We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both."

We shall assume as a fact that the appellee-libellants in these cases made no inquiry or investigation in respect to the authority of the one (in these cases the owner) ordering the supplies and repairs to bind the ships by maritime liens. If the Act requires inquiry to be made in every instance, wholly without regard to what an inquiry, if made, would disclose, then the libellants here are not entitled to maritime liens for supplies and repairs. But we do not understand the language of the Supreme Court in the Clio Case to mean that inquiry shall be made in situations where inquiry would disclose nothing. In other words, we do not understand that the law requires a materialman or a repair man to do a futile thing. Therefore, when a maritime lien is claimed the courts will ascertain, first, whether "the furnisher," not knowing, could "by the exercise of reasonable diligence * * * have ascertained that * * * the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." If by the exercise of such diligence he could have found out, then, again, he is not entitled to a maritime lien; but if by the exercise of such diligence he could not have found out, then we think the presumption afforded by the Act stands.

[2, 3] If the libellants in these cases—the "furnishers"—had made an investigation of the authority of the Navigation Company, the owner, to bind the ship for supplies and repairs what, "by the exercise of reasonable diligence," could they have ascertained? First, they would have found that the ships' home port was Baltimore. The ships were then in the foreign port of Philadelphia. If they had asked to see the ships' papers they might or might not have been handed to them for there is no evidence as to where the papers were at that time. If, however, the papers were on board and produced, they would have shown that in 1918 the

ships were the property of the United States Shipping Board Emergency Fleet Corporation. With this information before them, diligence would, of course, have required them to go further, and, upon going further, they may have discovered the delivery certificates of the United States Shipping Board showing the delivery of the ships to the West Indian Navigation Company, the purchaser. But neither the documents of the ships, if available, nor the delivery certificates, if available, nor any other papers, so far as the evidence discloses, would have shown or suggested the mortgages which were recorded in Baltimore on November 20, on or about the dates when the ships arrived in Philadelphia. Moreover, they would not have found a copy of the mortgage as required by the Ship Mortgage Act. Even, if during the period before or at the time the supplies were delivered and the repairs made the libellants had prosecuted an investigation and had come across the ships' papers somewhere, they would not have found endorsements of the mortgages on them, for this essential act was not performed until January 14, 1921, which was after the libellants had begun and in some instances had completed furnishing supplies and making repairs. So, it was not until that date that the libellants could have found the provision in the mortgages against the owner incurring liens upon the ships, unless, indeed, without any suggestion from any available source the law required them to go to Baltimore, their home port, and search the ships' titles. We do not believe the statute, in demanding of the furnisher "the exercise of reasonable diligence" in ascertaining the owner's authority to bind the ship, intends by the word "reasonable" that the furnisher shall in every instance make an investigation complete in all details even to visiting the home port and searching the title of the ship. We are led to this conclusion because otherwise the Act of 1910, the forerunner of the Act of 1920, which was enacted to relieve furnishers from the rigor of the law as it then existed, as well as to facilitate navigation, would be ineffective and purposeless. We are therefore of opinion that if the libellants in these cases had with reasonable diligence made the investigation which the law required of them, they would have discovered nothing that would have withdrawn from them the presumption of the owner's authority given by a preceding section of the Act.

[4] But this does not help the appellee-libellants very much unless they are able to overcome the force of the decrees pro confesso entered for unlawful amounts in favor of the ships' crews and assigned to the Shipping Board, for if these decrees are final, they cannot be attacked collaterally either as to merits or amounts. On exceptions by the Shipping Board against the reduction of the amounts of these decrees the learned trial court did not say whether the decrees pro confesso were final or interlocutory. It nevertheless referred them, with the other claims, to the commissioner with the right of all claimants to attack them and with the result that their amounts were reduced. The learned trial court did this in an evident effort to prevent the obvious injustice of allowing the assigned wage claims of the Shipping Board and paying the Shipping Board money to which it admits it is not entitled, holding that the decrees were only evidential between the parties. For authority it cited The Boston (C. C.) 8 F. 628, and Benedict's Admiralty, § 504.

We have difficulty in following the rule adopted by the federal court in the cited jurisdiction (The H. A. Baxter [D. C.] 172 F. 260) because of our inability to regard a final decree otherwise than involving finality in all respects. We are of opinion that the decrees pro confesso are final decrees and we have been led to this judgment for the reasons very thoroughly discussed by Judge Morris of the District Court of the United States for the District of Delaware in his opinion filed in Loveland v. American Schooner Florence and Lillian, 2 F. (2d) 903, of which we here avail ourselves.

It is true that after the decrees pro confesso had been entered in the ex parte proceeding, the errors might have been corrected in one of several ways, namely; by appeal, or rehearing under admiralty rule 39, and, possibly, by bill in the nature of bill of review; the first of which would, of course, have to be taken within the time prescribed by the statute; the next, within sixty days of the decree; and the last within a period equal by analogy to that allowed by the statute for an appeal. But none of these things was done. It follows therefore that the decrees stand. As we can discover no valid way of disturbing them in respect to their unlawful amounts, we are constrained to hold that the Shipping Board may, if it persist, recover its proportion of the proceeds of the sales on the face of the decrees in whatever priority it is entitled.

When modified in harmony with this opinion the decrees will in all respects be affirmed.