AMERICAN MARINE CORPORATION

v.

The TOWBOAT Z–FOURTEEN, Her Engines, Tackle, etc.

No. 7897.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Dec. 27, 1961.

Hall, Raggio & Farrar, Lake Charles, La., Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., for libelant.

Lemle & Kelleher, New Orleans, La., Adams & Peters, Jennings, La., for respondent.

HUNTER, District Judge.

American Marine proceeds against the Z-FOURTEEN for repairs. The first of libelant's repairs was performed between the dates of December 7 and 19, 1959, consisting in the main of general engine overhaul, but in part ($4,933.84) of repairs to accidental damage sustained by the starboard engine. Some seventeen days later, on January 6, 1960, the vessel sustained further damage to its port main engine while towing in the Mississippi River, and was returned to libelant's yard where an exchange of the damaged engine for a rebuilt engine was accomplished at a cost of $29,795.00.

The exchange of engines was deemed more economical than repair of the damaged engine and also effected a saving in time. The accidental damage to the port main engine was represented to be a claim under the vessel's insurance coverage and the exchange of engines was approved as reasonable by insurance representatives. While the exchange of engines was taking place in January and February, 1960, certain other relatively minor repairs were accomplished also. The total of all of libelant's claims is $53,480.46.

The M/V Z-FOURTEEN was acquired by Fred B. Zigler in the summer of 1955. It was then known as M/V MARCO. The name was changed and the vessel was documented in Zigler's name in the Office of the Collector of Customs at Lake Charles, Louisiana, and was so documented at the time of Zigler's death. At all

times pertinent hereto the license was aboard the vessel, and the name and the home port of the vessel was prominently displayed on its stern and elsewhere. The vessel ownership was listed in a government publication widely used and consulted in the marine trade and entitled "MERCHANT VESSELS OF THE UNITED STATES."

On July 7, 1959, the Z-FOURTEEN was delivered by Zigler to Dupuis as charterer and he, Dupuis, put it into operation. The written charter which was signed by Zigler and Dupuis required the charterer, Dupuis, at his expense, to pay all of the operating costs of the vessel, including the cost of repairs. The charter contained in the usual clear and unmistakable language a provision forbidding the creation of maritime liens.[1]

The Z-FOURTEEN went into libelant's shipyard for repairs in early December of 1959 and remained for approximately twelve days. *Dupuis advised the libelant's Vice-President, Mr. Wilchar, that he, Dupuis, was the charterer of the vessel.* Wilchar also knew that the vessel was owned by someone named Zigler or by the Zigler interests in the Jennings area. We are convinced that American Marine was satisfied with the credit arrangements that it had made with Mr. Dupuis, namely, that the repair costs would be paid out of the vessel's earnings and out of a purported insurance claim. It was on this basis that libelant made the repairs to the Z-FOURTEEN. But regardless of that, the fact remains that libelant, without inspecting a copy of the charter agreement then aboard the vessel, or attempting by any means to ascertain the terms of the charter from Dupuis or Zigler, made the repairs. *Dupuis testified categorically that he told both Wilchar and Durant that he was the charterer of the vessel. Dupuis also testified that had they asked for a copy of the charter he would have shown it to*

*them. There was no question in Dupuis' mind as to his lack of authority. We accept this testimony as true.*

## THE LAW

The statutory scheme of maritime liens is contained in Sections 971–973, Title 46 U.S.C.A. Section 971 provides that any person furnishing repairs to a vessel upon the order of the owner, or a person authorized by the owner, shall have a maritime lien. Section 972 identifies those persons presumed to have authority from the owner. Section 973 provides:

"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; *but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."* (Emphasis ours.)

Section 973 has been explicitly interpreted by both the Supreme Court of the United States and the Court of Appeals for this Circuit. It is authoritatively settled that a repairman must inquire as to the authority of a person ordering the repairs if the vessel is to be bound, and that if such person is without authority the repairer does not get a lien. The Fifth Circuit, in Tampa,[2] with Judge Brown as its organ, put it this way:

"But when supplies have been furnished on the order of a charterer (or his ship Master) '* * * there is no question that the supplier is

1. Article IX of the charter reads as follows: "Neither the CHARTERER nor the Master of the vessel shall have any right, power, or authority to create, incur, or permit to be imposed upon the

vessel any liens whatsoever except for crews' wages * * * and salvage."

2. Tampa Ship Repair and Dry Dock Co. v. Esso Export Corporation, 237 F.2d 506.

charged with knowledge of the provisions of the charter when he either knows them or by reasonable diligence could have ascertained them. * * * [and] When * * * the charter party, with knowledge of which the material-man is charged, prohibits the creation of a lien for supplies ordered by the charterer or * * * [his] representative, no lien will attach.' Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 273, 275, 60 S.Ct. 937, 940, 84 L.Ed. 1197; 60 F.Supp. 937, 1940 A.M.C. 647."

The leading case in the United States Supreme Court is United States v. Carver, 1923, 260 U.S. 482, 43 S.Ct. 181, 182, 67 L.Ed. 361. The pertinent language which defines the duty to inquire is:

"If by investigation with reasonable diligence the material-man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both."

The rule of Carver is plain, unmistakable, and has been consistently followed. (Tampa Ship Repair and Dry Dock v. Esso Export Corporation, supra; The Western Wave, 5 Cir., 77 F.2d 695; Findley v. Red Top Super Markets, Inc., 5 Cir., 188 F.2d 834; United States v. Daniels Towing and Drydock, Inc., 5 Cir., 214 F.2d 501; The SENECA, E.D.La., 1960, 179 F. Supp. 847, affirmed First National Bank & Trust Co. of Vicksburg, Miss. v. The Seneca, 5 Cir., 287 F.2d 366.

■ We have here a charter which prohibited liens and a repairman who made no inquiry. By the exercise of reasonable diligence, the libelant could have ascertained that the charter prohibited the charterer from binding the vessel for the liens. The duty of American Marine Corporation to use reasonable diligence was plain and positive. Reiter-

ating and paraphrasing from the language of Tampa, supra, we will say: Oblivious as American Marine was, both to knowledge and the means of knowledge, their liens fall under the pungency of Justice Holmes' few but powerpacked words in Carver, supra:

"We regard these words as too plain for argument. They do not allow the material-man to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the material-man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both."

■ Libelant relies on three major premises to escape the general rule. First, it is urged that the charter agreement itself expressly excepted from the operation of its "Prohibition of Liens" clause those repairs which were the subject of insurance claims. We do not so interpret Article XI. The purpose of the insurance clause was to give the owner added protection and to insure that the charterer would protect the interest of the owner. (United States v. Carver, supra; The Seathunder, D.C.Md., 191 F. Supp. 807, 1961 A.M.C. 561.) It is noted in this connection that the charterer was required under the terms of the contract to fully insure the vessel. It is noted, too, that Dupuis has assigned his claims against the underwriters to the libelant here, who has filed suit against the underwriters in the Eastern District of Louisiana.

■■ Libelant's second contention is that the owner was directly tied to the operation of the vessel under the circumstances of this case. The case of Findley v. Lanasa, 5 C.C.A., 276 F.2d 907, is cited in support. That case involved a

Master who was an employee of the owner and had full authority to incur liens and is not at all pertinent to the facts of the instant case. Certainly, Zigler had an interest in the venture. Every owner of a chartered vessel does. This can make no difference because the terms of Section 973 make no distinction as to type of charter parties. Regardless of the technical refinements of the charter the owner has a right to protect his vessel against liens by inserting a prohibition of lien clause in the contract (and that is precisely what Zigler did), and if such a clause is inserted, it must be enforced. The Seathunder, D.C.Md., 191 F.Supp 807, 1961 A.M.C. 561.

Lastly, libelant asserts that "the owner of the vessel could not maintain silence in order to reap the benefits to be gained by the mistake of the shipyard." We understand this point to be in the nature of a plea of unjust enrichment. It seems to say that Mr. Zigler received back a vessel in good order and condition, and that the shipyard is holding the bag for the cost of repairs. The answer to this is that Dupuis was required at his expense to effect all repairs of the vessel and to return it in the same good order and condition as when he received it. This was a contractual obligation and Zigler had every right to expect and require Dupuis to comply with it. What arrangement the charterer made with the libelant as to payment was no concern to Zigler. In balancing the equities it must be realized that the libelant could have very easily ascertained the existence of the prohibition of lien clause and that it was libelant's statutory duty to make reasonable inquiry while Zigler had no way other than by the terms of the charter party to prevent the creation of liens against its vessel.

## CONCLUSION

We agree with counsel for Zigler that the crux of this case lies in the language of the charter, denying to the charterer "any right, power or authority to create, incur or permit to be imposed upon the vessel any liens whatsoever." Had libel-

ant made inquiry of Dupuis he would have confirmed this provision and denied his authority. Libelant failed to inquire as to Dupuis' authority; its failure to do so was at its own peril. The libel is dismissed at libelant's costs. Findings of Fact, Conclusions of Law, and Judgment should be submitted by attorneys for the Z-FOURTEEN.