WILSON, Circuit Judge,
dissenting, in which MARTIN, Circuit Judge, joins:
The majority today not only reaches the wrong answer, it asks the wrong question. Suppose that, instead of a beyond-a-reasonable-doubt standard, the State of Georgia required mentally retarded death-row inmates to prove their Atkins[1] claims beyond any shadow of a doubt — -a standard requiring, under Georgia law, that prisoners obtain the unanimous consent of a 100-member panel of state-appointed psychologists, ten consecutive IQ tests showing an intelligence quotient of not more than thirty, and supporting affidavits from the victims’ families and the Governor. Could fair-minded jurists disagree that the foregoing standard is unconstitutional? Of course not. But in order to endorse not only the result, but the logic of today’s majority opinion, one must answer yes.
We are not asking whether the Supreme Court has determined that the Constitution requires a particular burden of proof for Atkins claims; it plainly has not. We are not asking whether the Supreme Court has left it to states to draw the exact boundaries and define the precise contours of the right announced in Atkins; it plainly has. Our job, instead, is simply to ask whether it is beyond fair-minded disagreement that the boundaries applied by the State of Georgia in this case run afoul of Supreme Court holdings, including that of Atkins itself.
I believe that it is, and I endorse the substance of Judge Barkett’s dissent. However, I part company with Judge Barkett in that I tend to see this as an “unreasonable application” — instead of a “contrary to” — case under AEDPA and, therefore, conceptualize our inquiry as follows.
Atkins declared a federal constitutional right, but left it to the individual states to define that right’s exact boundaries— thereby creating a zone of discretion for state action.[2] On habeas review, AEDPA essentially broadens that zone of discretion, so that federal courts must respect states’ boundaries (i.e., definitions, procedures, burdens, etc.) even if those courts believe them to be erroneous, so long as they are not unreasonable. Nevertheless, at some extreme point, the clear mandate of Atkins and the Due Process Clause must limit a state’s ability to set overly restrictive boundaries. And in rare cases, a state’s Atkins boundaries may be so restrictive that they fall outside of even the AEDPA buffer to the Atkins zone of discretion. For the reasons described in Judge Barkett’s dissent, I believe this is one of those rare cases.
*1379 It is no answer to simply say that the Supreme Court has not explicitly passed on the Atkins burden of proof question, or that Atkins left it to the states to set their own procedures. AEDPA “recognizes ... that even a general standard may be applied in an unreasonable manner.” Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007). And with respect to the particular general standard at issue in this case — that it is unconstitutional to execute every class of mentally retarded persons (i.e., mild, moderate, severe, and profound) — we have a unique perspective on what it means for that standard to be applied unreasonably. The Supreme Court has already shown us by analogy.
Atkins relied, in large part, on a recently developed national consensus against executing every class of mentally retarded persons. 536 U.S. at 313-16, 122 S.Ct. at 2248-50. But recognizing that there may be “serious disagreement^]” about determining exactly “which offenders are in fact retarded,” and that “[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus,” the Court declared: “As was our approach in Ford v. Wainwright, with regard to insanity, ‘we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ ” Id. at 317, 122 S.Ct. at 2250 (alterations in original) (citing 477 U.S. 399, 405, 416-17, 106 S.Ct. 2595, 2599, 2605, 91 L.Ed.2d 335 (1986) (holding that the Constitution forbids execution of the insane)) (internal citation omitted). Consequently, Ford is our guide for understanding of what is, and what is not, an “appropriate way[ ] to enforce” the Atkins constitutional restriction.
Upon turning to the cited portions of Ford, we discover that the Supreme Court’s delegation to the states has limits. After determining that it is unconstitutional to execute an insane person, the Court addressed what was required of states in the setting their own procedures. See Ford, 477 U.S. at 416-17, 106 S.Ct. at 2605 (plurality opinion). It began by confirming that states should have substantial discretion in choosing their methods, stating that “a full trial on the issue of sanity” was not required to “protect the federal interests” at stake. See id. And it specifically recognized that “some high threshold showing on behalf of the prisoner” may be “a necessary means to control the number of nonmeritorious or repetitive claims of insanity.” Id. at 417, 106 S.Ct. at 2605. But after acknowledging that states must have flexibility in determining who is, and who is not, legally insane, the Court’s instructions culminated with this clear and forceful mandate:
Yet the lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging the accuracy in the factfinding determination.
Id. (emphases added). I believe Judge Barkett’s opinion demonstrates beyond any reasonable dissent how Georgia’s procedures cannot be squared with this explicit admonition. And if there was any doubt about how those dual imperatives interact with our current deferential standard of review under AEDPA, it was resolved by the Supreme Court’s example in Panetti v. Quarterman, 551 U.S. at 954, 127 S.Ct. at 2859.
In Panetti, the Supreme Court — in a materially indistinguishable posture from that which we occupy today — addressed whether Texas’s procedures for applying Ford’s general constitutional prohibition *1380 were contrary to or an unreasonable application of clearly established federal law. Id. at 952-54, 127 S.Ct. at 2858-59. Notwithstanding Ford’s explicit delegation to the states and AEDPA deference, the Supreme Court concluded that Panetti was entitled to plenary federal review of his constitutional claim. Id. at 954, 127 S.Ct. at 2859. Recognizing that Justice Powell’s controlling concurrence in Ford mandated that a state’s “substantial leeway [in] determining] what process best balances the various interests at stake” be limited by “the ‘basic requirements’ required by due process,” the Court found myriad defects in the State’s approach to enforcing Ford’s constitutional restriction warranting de novo review. See id. at 950-52, 127 S.Ct. at 2856-57 (cataloging errors demonstrating that “the state court failed to provide petitioner with the minimum process required by Ford”). It did so notwithstanding a lack of specific case law on Panetti’s particular complaints as today’s majority would require, but by relying instead on Justice Powell’s general discussion regarding the basic requirements of due process, as well as the Court’s own assessment that “[t]he state court failed to provide petitioner with a constitutionally adequate opportunity to be heard.” Id. at 952, 127 S.Ct. at 2858. In other words, the Supreme Court recognized that Ford set a constitutional floor, not a target. And because “the factfinding procedures upon which the [state] court relied were ‘not adequate for reaching reasonably correct results’ or, at a minimum, resulted in a process that appeared to be ‘seriously inadequate for the ascertainment of the truth,’ ” they represented an “unreasonable application” of Ford’s general standard under AEDPA. Id. at 954, 127 S.Ct. at 2859 (quoting Ford, 477 U.S. at 423-24, 106 S.Ct. at 2609 (opinion of Powell, J.)).[3]
The Supreme Court in Atkins unequivocally held that the Constitution prohibits the execution of mentally retarded persons. 536 U.S. at 321, 122 S.Ct. at 2252. And it unequivocally invoked its approach in Ford. Id. at 317, 122 S.Ct. at 2250. Moreover, as Judge Barkett’s opinion demonstrates, there are several other unimpeachable — albeit general — principles of constitutional law that must be brought to bear in our determination of where Atkins’s constitutional floor was set and what exactly it proscribes. In particular, I find the majority’s attempt to ignore the guidance of cases such as Cooper v. Oklahoma, 517 U.S. 348, 366-69, 116 S.Ct. 1373, 1382-84, 134 L.Ed.2d 498 (1996) (holding that state law requiring defendant to prove incompetence to stand trial by clear-and-convincing evidence violated the Due Process Clause), and Addington v. Texas, 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979) (holding that the burden of proof for involuntary civil commitment must exceed a preponderance of the evidence) entirely unavailing; in Ford, the Supreme Court explicitly referenced the procedures governing these parallel proceedings as “instructive analogies” that inform states’ choices of how to appropriately enforce Ford’s constitutional mandate. 477 U.S. at 416-17 & n. 4, 106 S.Ct. at 2605 (plurality opinion).
As the Supreme Court did in Panetti, we must consider all relevant clearly established legal rules and standards to make a substantive determination, through the lens of the reasonable jurist, as to *1381 where Georgia’s procedure falls on the spectrum of constitutional appropriateness, relative to the floor set by Atkins. In other words, in this Atkins case, we are not asking what the constitutionally proper burden of proof is. We are not even asking what the constitutionally proper burden of proof should be. We are simply asking what the constitutionally proper burden of proof cannot be. And it cannot be this.
The beyond-a-reasonable doubt standard is patently inappropriate in the Atkins context. Since the majority invokes the useful, but imperfect parallel of cases dealing with burdens of proof and mental illness, I rely upon the words of Chief Justice Burger, speaking for a unanimous Supreme Court, to illustrate the point:
The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical “impressions” drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient. Within the medical discipline, the traditional standard for “factfinding” is a “reasonable medical certainty.” If a trained psychiatrist has difficulty with the categorical “beyond a reasonable doubt” standard, the untrained lay juror — or indeed even a trained judge— who is required to rely upon expert opinion could be forced by the criminal law standard of proof to reject commitment for many patients desperately in need of institutionalized psychiatric care.
Addington, 441 U.S. at 430, 99 S.Ct. at 1811.
Just like a psychiatric diagnosis of mental illness, the psychological diagnosis of mental retardation deals not with “specific, knowable facts,” but, “in contrast, is to a large extent based on medical ‘impressions’ drawn from subjective analysis and filtered through the experience of the diagnostician.” What is more, unlike a diagnosis of mental illness, which deals solely with the defendant’s mental state today, a diagnosis of mental retardation relies on the defendant’s mental capacity years, if not decades, in the past. See, e.g., O.C.G.A. § 17-7-131(a)(3) (defining mental retardation as requiring intellectual deficiency during a person’s “developmental period”). Moreover, since in reality a mildly retarded defendant can only prove an Atkins claim using expert medical testimony, I am struck by the gross disparity between the certainty communicated to the factfinder by that type of expert opinion— a reasonable degree of medical certainty— and that required by Georgia’s Atkins burden of proof — proof beyond any reasonable doubt. What alchemy might allow a mildly retarded Atkins petitioner to transform these imprecise, subjective, and retrospective elements into a successful constitutional claim in Georgia is beyond my imagination.
Whatever standard the Supreme Court may one day set, even with the shield of AEDPA deference, Georgia’s current burden of proof does not honor the command of Atkins. As a consequence, I respectfully dissent.

. Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct 2242, 2252, 153 L.Ed.2d 335 (2002) (holding that execution of mentally retarded criminals is unconstitutional).

. Contrary to the majority's contention, the Supreme Court's denial of certiorari in three cases where Georgia inmates challenged the burden of proof for establishing mental retardation in no way reflects the Court's approval of Georgia's standard. See, e.g., Missouri v. Jenkins, 515 U.S. 70, 85, 115 S.Ct. 2038, 2047, 132 L.Ed.2d 63 (1995) ("Of course, ‘the denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times.' " (quoting United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923))).

. Panetti provides the clearest and most instructive Supreme Court guidance on how we must conduct the inquiry before us. Although not a case specifically involving mental retardation (and, in the majority’s view, therefore completely inapposite), Panetti elucidates the standard of AEDPA deference due when federal courts consider the constitutionality of procedures that burden a petitioner's substantive constitutional rights.