**UNITED STATES**

v.

**DANIELS TOWING & DRYDOCK,
Inc. et al.**

**No. 14597.**

United States Court of Appeals
Fifth Circuit.

June 30, 1954.

Rehearing Denied Aug. 9, 1954.

Dawkins, District Judge, dissented in part.

William T. Foley, Jr., Atty., Dept. of Justice, Leavenworth Colby, Sp. Asst. Atty. Gen., Admiralty & Shipping Section, Washington, D. C., Fred Botts, Asst. U. S. Atty., Miami, Fla., Warren E. Burger, Asst. Atty. Gen., James L. Guilmartin, U. S. Atty., Miami, Fla., for appellant.

Robert F. Underwood, Miami, Fla., Martin Sack, Jacksonville, Fla., Alexander S. Gordon, Knight, Smith & Underwood, Miami Beach, Fla., for appellee.

Before STRUM, and RIVES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

This is an amended libel by Daniels Towing and Drydock, Inc. against East Coast Shipping Co., Inc., the bareboat charterer of certain Navy barges, for which its trustee in bankruptcy was substituted, and against the United States of America, the owner of the barges, the libel being based on a contract for towage services. Two principal questions are presented for decision by this Court: (1), whether the district court had power to refer the entire case to a special commissioner for findings and conclusions thereafter adopted by the court; and (2), whether, under the evidence, the United States became liable for the towage services. We pretermit decision of the first question, because we are of the opinion, for reasons hereafter stated, that, regardless of the method of trial, the second question must be answered in the negative.

On about June 1, 1950, Elmore Daniels, as president of Daniels Towing and

Drydock, Inc., hereafter called Daniels, and Louis Berger, the then president of East Coast, entered into an oral contract for Daniels to tow the barges designated as YC–847, YC–848, and YC–849 from Cape May, New Jersey, to Miami, Florida. East Coast agreed to pay Daniels $3,000.00 in consideration of Daniels sending its tug, Marion Adele, from Miami to pick up the three barges and to return with them to Miami. A tug owned by East Coast was to tow three other similar barges. On the trip North, the accompanying tug of East Coast broke down and the Marion Adele towed it to Wilmington, North Carolina for repair, occasioning a delay of eight days. A further delay of four days was encountered at Cape May, New Jersey, awaiting the arrival of a third large ocean-going tug towing the six Navy barges from the Brooklyn Navy Yard. Daniels and Berger had a supplemental agreement that Daniels would be compensated for the aggregate twelve day delay at $75.00 per day, or $900.00. East Coast failed to meet Daniels' demand for payment of the $3,900.00, and this libel ensued. There is no question but that East Coast became liable for the $3,900.00 towage services. The decisive question is whether the United States also became liable.

█ There is a direct conflict in the testimony as to whether Daniels knew from the beginning that the barges it was engaged to tow belonged to the United States. Berger testified that he told Daniels that the barges were at the Brooklyn Navy Yard and were being leased from the Navy. Daniels testified, on the other hand, that Berger told him East Coast had purchased the six barges, that its tug would tow three and he wanted Daniels to tow three of the barges to Miami. We proceed upon the as-

sumption, under the trial court's findings, that Daniels was the one who told the truth. Daniels admitted, however, that in prior dealings with Berger, he had heard that Berger had chartered other barges from the Navy.[1] He also knew that Berger had been put out of the barge line business by the two people who had gone into the business with him, and had met financial reverses earlier in the same year, 1950. Daniels had nothing on which to rely as to the ownership of the barges other than the bare statement from Berger that East Coast had bought the barges. He made no request to see the bill of sale, and, in fact, no inquiries whatever concerning the alleged claim of purchase.[2]

Daniels personally never did see the Navy barges. His employees first saw the barges and their markings when they took the barges in tow at Cape May. At that time the words "U S Navy" were painted on the barges in letters three feet high, and together with the Navy numbers and symbols were clearly visible and were, in fact, observed by the Captain and crew of Daniels' tug. Even after such notice, no further inquiry was made as to the ownership of the barges. Daniels' employee Emery admitted:

"Q. (By Mr. Underwood) Have you ever seen a barge you knew was owned by some particular individual, which still had the numbers and letters on them? A. No. I don't know who owned them."

The charter party provided:

"Neither the Charterer nor the Master of any of the Vessels shall have the right, power or authority to create, incur or permit to be imposed upon any of the Vessels any liens whatsoever. The Charterer agrees to carry a properly certified

1. "Q. As a matter of fact, you knew he was chartering his equipment, the barges, from the navy? A. No, I have heard it, but I don't know."

2. "Q. You knew he was not financially well off, didn't you? A. I did not think he was; I couldn't say.

"Q. Did you ask him where he had bought these barges? A. No, I did not.

"Q. From whom he had bought them? A. No.

"Q. How much he had paid for them? A. No."

copy of this charter party with the papers of each of the Vessels and on demand to exhibit the same to any person having business with any of the Vessels which might give rise to any lien thereon. The Charterer further agrees to fasten and maintain in a conspicuous place on each of the Vessels during the life of this charter party a notice reading as follows:

" 'This tug (or barge) is under charter from the United States of America, represented by the Chief of the Bureau of Ships of the Department of the Navy, to the East Coast Shipping Co., Inc. and by the terms of said charter neither the Charterer nor the Master has any right, power or authority to create, incur or permit to be imposed upon this tug (or barge) any liens whatsoever.' "

The barges, however, were open barges with no place provided for papers,[3] and East Coast did not post the notice as it had agreed.

The libellant answered "No" to the following interrogatory:

"Tenth: Please state whether libelant or any of its officers, employees or agents made or caused to be made any inquiries as to what agreement the lighters YC–847, YC–848 and YC–849 were being operated under at the time the towage services and assistance mentioned in the

libel and complaint, as amended, and Schedule A, annexed thereto, are alleged to have been requested and rendered."

■■ If it be assumed that these Navy barges owned by the United States were employed as merchant vessels when the towage was performed, still the United States would be liable for the towage only if a vessel privately owned and possessed would be liable under the same facts and circumstances. 46 U.S. C.A. § 742. A person furnishing towage would have a maritime lien on the barges, if privately owned, only if such towage were procured by an authorized person, 46 U.S.C.A. §§ 971, 972, and reasonable diligence to ascertain such authority is required of the person furnishing such towage.[4] On the facts taken most favorably to Daniels, and under cases decided on similar facts,[5] we think it clear that no maritime lien for towage would have attached to the barges had they been privately owned, and, hence, that the United States did not become liable for the towage services.

The judgment is, therefore, reversed and the cause remanded with directions to dismiss the libel as against the United States. See 28 U.S.C.A. § 2106.

Reversed and remanded with directions.

DAWKINS, District Judge, dissenting in part.

---

3. Libellant's witness Emery testified:
   "Q. Do barges, or would this particular barge, or these three barges have any place for such papers? A. No, sir.
   "Q. There wasn't any pipe there in the head of it that would contain them, if it had any? A. No, sir.
   \* \* \* \* \*
   "Q. (By Mr. Gordon) These three barges were open barges, is that correct? A. That is correct."

4. 46 U.S.C.A. § 973:
   "*Notice to person furnishing repairs, supplies, and necessaries*
   "The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and

agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

5. United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361; The Western Wave, 5 Cir., 77 F.2d 695; The Kongo, 6 Cir., 155 F.2d 492.

DAWKINS, District Judge (dissenting, in part).

I agree with the ruling on the first point stated in the opinion of the majority, but dissent as to the second.

The record reveals that the charter party under which East Coast acquired possession of the barges, provides:

"Neither the Charterer nor the Master of any of the Vessels shall have the right, power or authority to create, incur or permit to be imposed upon any of the Vessels any liens whatsoever. *The Charterer agrees to carry a properly certified copy of this charter party with the papers of each of the Vessels and on demand to exhibit the same to any person having business with any of the Vessels which might give rise to any lien thereon. The Charterer further agrees to fasten and maintain in a conspicuous place on each of the Vessels during the life of this* charter party a notice reading as follows:

" 'This tug (or barge) is under charter from the United States of America, represented by the Chief of the Bureau of Ships of the Department of the Navy to the East Coast Shipping Co., Inc. and by the terms of said charter neither the Charterer nor the Master has any right, power or authority to create, incur or permit to be imposed upon this tug (or barge) any liens whatsoever.' " (Emphasis supplied.)

Before the hearing, Proctor for the Government propounded to the libelant a series of interrogatories as to the circumstances under which it was engaged to tow the barges to Miami. They were answered by its President, Elmore Daniels, the pertinent portions of which are quoted in footnote.[1]

It is insisted that libelant, through its president in response to interrogato-

1.—Interrogatories:

"First: Please give the name or names of the person or persons who ordered the towage services and assistance referred to in Articles 3, 4 and 5 of the libel and complaint, as amended, and Schedule A annexed thereto. If the order or orders were in writing, attach copies of the same.

"Answering Interrogatory 1—Louis Berger, President of East Coast Shipping Co., Inc. Not in writing.

\* \* \* \* \*

"Third: *Please state whether the libelant or any of its officers or employees made or caused to be made any inquiries as to the relation of the person or persons giving the order or orders to the lighters YC-847, YC-848 and YC-849.*

"Answering Interrogatory 3—*Yes; representation of the said Louis Berger that he owned the subject barges.*

"Fourth: *If your answer to the third interrogatory is in the affirmative, please state what inquries were made, by whom they were made and of whom they were made.*

"Answering Interrogatory 4—*Inquiries were made by Elmore Daniels, President of Daniels Towing & Drydock Inc. of the said Louis Berger.*

"Fifth: Please state the information obtained on these inquiries. If same was obtained in writing, attach copies of the writings.

"Answering Interrogatory 5—The information obtained on these inquiries was that the said East Coast Shipping Co., Inc. had purchased the barges. There was nothing in writing.

\* \* \* \*

"Eighth: *Please state whether libelant or any of its officers, employees or agents knew that lighters YC-847, YC-848 and YC-849 were owned by the United States and/or the Department of the Navy.*

"Answering Interrogatory 8—*No.*

"Tenth: Please state whether libelant or any of its officers, employees or agents made or caused to be made any inquiries as to what agreement the lighters YC-847, YC-848 and YC-849 were being operated under at the time the towage services and assistance mentioned in the libel and complaint, as amended, and Schedule A, annexed thereto, are alleged to have been requested and rendered.

"Answering Interrogatory 10—No.

\* \* \* \* \*

"Twelfth: Please state, if it is not a fact, that the bulwark planking and posts of lighters YC-847, YC-848 and YC-849 were painted gray and that the symbols YC-847, YC-848 and YC-849 were painted in white letters on the said planking.

"Answering Interrogatory 12—Yes."
(Emphasis by the writer.)

ry No. 10, admitted that it had not made any inquiries as to what the agreement was under which the barges were to be operated, at the time the towing contract was made. However, if the sworn answers by Daniels to the earlier interrogatories that Louis Berger, president of East Coast Company, had informed him that this company had purchased the barges, were true, then it follows that there was no occasion for the further inquiry contained in interrogatory No. 10. It did not mean that he, Daniels, had said no inquiry as to the ownership had been made. *On the contrary, the interrogatories and answers quoted in footnote were to the effect Daniels did inquire as to the ownership,* and the matter depends upon the sufficiency of that inquiry, in the light of the circumstances surrounding the towage agreement.

In the first place, there was nothing in writing and the entire arrangements, both in the original agreement and for the compensation to be paid on account of the breakdown of East Coast tug, as well as the second delay in the delivery of the barges at Cape May were verbal. Libelant's president, who made the agreement for his company, never saw the barges at all until they reached Miami at the completion of the contract, and the facts with respect to their condition for carrying papers, marks, etc., were matters coming to the knowledge only of his agents who were in charge of the towing expedition. Even as to them, this condition was unknown until the barges were delivered to Cape May when the trip was at least half complete and the delay expenses had all been incurred as agreed upon. It is true that one of libelant's witnesses, Emery, on cross examination by proctor for East Coast, not for the Government, testified, that these were open barges with no place on them for keeping title, or other papers, showing ownership or the terms under which East Coast was to operate them. However, Emery did say that, "We was all over the barges and if there had been anything (papers) there I would have seen it."

We have to bear in mind that, as stated earlier, notwithstanding notice and full opportunity to appear and be heard, no one appeared for the Government, appellant, and the only evidence offered to dispute that of Daniels was offered by East Coast, which, at the time, was a bankrupt and had been succeeded in the litigation by its trustee. The following is quoted from the report of the Commissioner:

> "East Coast Shipping Co., Inc., through Mr. Louis Berger, its former president and Alexander S. Gordon, its Proctor appeared at the hearing. From an examination of the record of the cause, the Commissioner is of the opinion that these parties had no official status in the proceeding. However, the Commissioner permitted the parties to remain at the hearing and to adduce the testimony of said Louis Berger, with the idea in mind that this Witness' testimony would be in the record for the eventual benefit of the United States of America and the Trustees in Bankruptcy, who were not present pursuant to notice. Frankly, the Commissioner considered the hearing before him ex-parte, in view of the absence of the United States of America and the said Trustee in Bankruptcy, and in making determination in this cause, is not taking into consideration the testimony of Louis Berger. However, if the United States of America and Al Easlin, as Trustee in Bankruptcy, were to adopt the testimony of Louis Berger in support of their defense and the Commissioner were directed by this Court to consider that testimony, his resulting opinion would not vary from the one hereinafter announced."
> (Emphasis by the writer.)

When the hearing before the Commissioner began, attorneys for libelant invoked the rule of excluding witnesses

from the courtroom, including the Trustee, as to which the following took place:

"The Commissioner: I feel like personally, he (the Trustee in Bankruptcy) probably ought to be permitted to remain in the room. Are you objecting to his remaining in the room, Mr. Underwood?

"Mr. Underwood: *Not if we clarify the status so we may know what the status of the East Coast Shipping Company is in this lawsuit. The Commissioner will observe from the file that this suit was originally filed naming the East Coast Shipping Company as party defendant. It is an interim proceeding against the barges and in personam against East Coast Shipping Company. However, process was never made on East Coast Shipping Company because after the filing of the suit, it was then made known to the shipping company that the barges were in fact owned by the Government. By order of the Court we were compelled to drop them and proceeded in personam against the government under the statute, isn't that right, Alex?*

"Mr. Gordon: (Attorney for East Coast) *That is right, Bob.*

"Mr. Underwood: *Thereafter it was made known in the record that the East Coast Shipping Company was adjudged bankrupt and the Trustee was substituted in lieu of the East Coast.*

"*We took the position through the pleading process under the statute we were proceeding under, in which we were authorized to proceed against the government, that the East Coast Shipping Company or its Trustee was not a necessary party to the adjudication of the issues in this case.* However, Judge Holland either on his own motion or the motion of the Trustee—it was not our motion—he entered an order that the Trustee should be required as a party defendant in the case.

"*The record indicates that the Trustee in Bankruptcy for the East Coast has since been discharged, as such, and I, frankly, therefore, don't know what his status is.* He has not been discharged except by reference in this record. There has been no order dismissing him as a party defendant in this case.

"The Commissioner: The record in this case before me does not disclose he has been discharged as far as he is concerned.

"Mr. Gordon: I will join with Mr. Underwood in pleading ignorance of the status of the Trustee in Bankruptcy at the present time in this case. I know he was impleaded by order of the Court. Insofar as the record of the case is concerned, he is still a party.

"Mr. Underwood: *Mr. Humkey, I think it would be in order at this time to likewise settle upon the issues in the case if we can.*

"The Commissioner: *I want to do that. I am going to permit Mr. Berger to remain in the room during the course of this proceeding, in spite of the fact that the rule has been invoked and his status, so far as the East Coast Shipping Company is concerned, is in some doubt, I might say.* I consider from the file that East Coast Shipping Company is still a party in this proceeding.

"Mr. Underwood: *May I ask we clarify Mr. Gordon's status?*

"The Commissioner: *I would like for the record to show that notice of this proceeding was forwarded to proctors representing all parties by way of a letter from the Special Commissioner, bearing the date of July 9th, 1952; that the only proctors appearing are Mr. Robert Underwood of Knight, Smith & Underwood, representing the libelant, and Mr. Alexander S. Gordon, representing the East Coast Shipping Company.*" (Emphasis by the writer.)

Daniels, president of libelant, was called as its first witness and it was stipulated (between proctors for libelant and East Coast) that his company had been engaged to tow the barges and that the price was $3,000.00; further that the lay time caused by the delays both at Wilmington, N. C., while East Coast's tug was being repaired for eight days and at Cape May for four days, while waiting for the arrival of the barges, should be paid for at the rate of $75.00 a day, or a total of $900.00. The witness' testimony as to how the original towing agreement was made is quoted in footnote.[2] The cross examination by the attorney for East Coast is also quoted in footnote.[3]

The witness was then questioned at length as to his knowledge of Berger's financial status and whether he knew the latter had been chartering vessels from the United States Navy. Daniels admitted he knew that the East Coast had experienced some trouble financially, but denied any knowledge that it was chartering barges from the Navy.

Louis Berger was "called as a witness * * *", but for whom was not stated, and his testimony so far as pertinent is quoted in footnote.[4] The witness then testified as to negotiations with Daniels looking to their pooling interests in the barge line business, in January, 1950, and that he informed Daniels as to his equipment, as quoted in footnote.[5]

2. "Q. Now, Mr. Daniels, back to the conversation you had with Mr. Berger in Miami preliminary to your rendering these services, *did you receive any information as to the ownership or the identity of the owners of the barges you were going to tow from Cape May?* A. Yes, sir.

"Q. *What information did you have, and from whom?* A. *Mr. Berger.*

"Q. *What information did he give you?* A. *He came to my office and said he had bought six barges, if I remember correctly, and he wanted me to go make a trip and tow three of them back from some little town near Norfolk, Virginia at the time.*

"Q. *Did I understand he told you he purchased these barges?* A. *Yes.*

"Q. *And he was the owner of the barges?* A. *That he had purchased six barges and he was going to send his tug to get three and wanted me to go tow three of them down.*

"Q. *Did he at any time tell you anything about a charter or lease he had with the United States Government on these barges?* A. *No, sir.*

"Q. *Did anyone else ever give you that information prior to the filing of your libel in the United States Court?* A. *No, sir.*" (Emphasis by the writer.)

3. "Q. Getting back to this contract to go to Cape May or thereabouts, when was it made, Mr. Daniels? A. To the best of my recollection, it was around the first of June.

"Q. What year? A. I guess it must have been 1950.

"Mr. Underwood: Let's don't do any guessing. If you have to do anything to refresh your memory, you may refer to the Exhibit here.

"Q. *Did Mr. Berger talk to you about this contract in person, or on the telephone only?* A. *About the trip up there?*

"Q. *Yes.* A. *Just in person.*

"Q. *In your office?* A. *Yes.*

\*    \*    \*    \*    \*

"Q. *You say Mr. Berger told you he had bought the six barges?* A. *Yes.*

"Q. *Did he tell you from whom he had bought them?* A. *No, sir.*

"Q. *Did he tell you how much he paid for them?* A. *No.*

"Q. *You say Mr. Berger told you he bought them?* A. *No, sir.*" (Emphasis by the writer.)

4. "Q. *What type of floating equipment did the East Coast Shipping Company utilize in its operation?* A. *We had six covered barges 110 x 30 x 8; nine open lighters 110 x 30 x 8, which we leased from the U. S. Navy, and five open lighters 100 x 30 x 8 which we had purchased, all wooden equipment.*

"Q. *Purchased from whom?* A. *The Union Paper Bag Company. Also, we had two tugs 68 x 24 x 8½ which we had leased from the U. S. Navy.*" (Emphasis by the writer.)

5. "I had told Mr. Daniels at that time *that I had an opportunity of leasing six more open barges which would give us 14 barges* to throw into this service, but we did not have sufficient towing equipment, and could we get together with his tugs and my barges and strike a deal. Mr. Daniels said yes, he thought it could be arranged. That is the gist of that conversation." (Emphasis by the writer.)

\*    \*    \*    \*    \*

508

Thus it appears that appellant made no appearance at the hearing before the Commissioner, notwithstanding timely notice, but now seeks to take advantage of testimony offered by East Coast, who was no longer a party to the litigation, having been dismissed when its bankruptcy was made known to the Court, and the Government substituted in its place. Berger's testimony was allowed to go into the record through the tolerance of the Commissioner, who correctly held, I think, that East Coast had no right to participate in the hearing, but that either libelant, or the Government, had it been represented, might have called Berger as a witness.

"Q. Did you tell him where these six barges were located? A. At that time I did not know where they were.

"Q. From whom did you lease them? A. The Navy.

"Q. Did you tell him that? A. Yes, sir.

"Q. Did you tell him the price of the charter? A. Yes, sir.

"Q. What was that? A. One dollar a day per barge.

"Q. That was the first part of 1950? A. Yes, sir.

"Q. What happened after that with respect to the six barges? A. I proceeded to get the six barges. I went to Washington and they sent me to the Brooklyn Navy Yard and I looked at a number of barges and made a lease, or it was added to the lease on other equipment, and the next time I saw Mr. Daniels was for the purpose of bringing the barges down from Chesapeake City.

"Q. When was that that you next saw Mr. Daniels or spoke with him? A. I guess it was some time in June. It might have been the latter part of May. I don't exactly remember. It was somewhere around close to June." (Emphasis by the writer.)

*    *    *    *    *

"Q. Are you now recounting the conversation? A. I am saying the reason for it. Therefore, we chartered and made a deal with the MacAllister Towing Company out of New York to deliver to Chesapeake City and Mr. Daniels' and my tug would pick them up and bring them south. We agreed on the price of $3,000.00 from Chesapeake City to Miami.

"Q. What happened with the deal between you and Daniels with respect to putting on his tugs? A. In the interim

It seems clear that Berger had two reasons for testifying as he did, (1) East Coast was a bankrupt and the libelant would be relegated to asserting its claim against that estate, which, it was stated at the hearing, had already been wound up and the Trustee discharged, and (2) he was the surety on a bond given to the Government to protect it under the charter party. The Commissioner saw and heard all the witnesses testify and decided Daniels rather than Berger, was telling the truth, and the judge, by his approval, was evidently of the same view. This meant that in their opinion the contract had been made in good faith, and the markings on the

the Air Force came up with five shallow draft tugs of their own that were available for lease or charter. I went along on the theory of doing it all by myself instead of splitting it with Mr. Daniels.

"Q. When you had your conversation with him about going up to Chesapeake City, did you tell him where the barges were coming from? A. Yes.

"Q. What did you tell him? A. I told him I had leased six more open barges at the Brooklyn Navy Yard in New York, * * *" (Emphasis by the writer.)

*    *    *    *    *

"Q. You are certain you told Mr. Daniels the barges were being leased from the Navy? A. Yes, sir.

"Q. Coming from the Brooklyn Navy Yard? A. Yes, sir.

*    *    *    *    *

"Cross Examination

"Q. (By Mr. Underwood) Mr. Berger, how many barges did you have at that time, when you got these six from the Navy? A. Prior to the six?

"Q. Yes. A. Six covered, three open, and five we had bought from the Union Paper Bag Company in Savannah.

"Q. Had you bought any from the Navy? A. No, sir.

"Q. These others you had, other than the six that came down, you say they had the Navy signs and symbols on them? A. The Navy equipment, all of it, had Navy lettering and the lettering 'U. S. Navy', and the number that was assigned to the barge.

*    *    *    *    *

"Q. Are you a surety on this bond given by the East Coast Shipping Company, Inc. to the United States Government? A. Yes, sir." (Emphasis by the writer.)

barges were not sufficient to overcome the statement of Berger that he had purchased them. This belief was further evidenced by the fact that the libel was brought originally against the barges and against the East Coast in personam.

The sole basis for reversing these findings, is the presence on the barges of the initials "U. S. N." which the evidence shows were faded and the paint on them was in bad condition, indicating that they had been laid up and were probably sold as surplus. Not only do we have the positive testimony of Daniels that Berger claimed to have purchased the barges, but the undisputed proof that the latter failed to "fasten and maintain in a conspicuous place on each of the vessels, during the life of this charter party" the notice quoted in that part of said charter party quoted earlier herein. I daresay that if these barges had been leased to East Coast by a private individual or corporation, with only the name of the owner thereon, we would be loathe to reverse the trial court. The Government's position, under the statute relied upon, was the same as that of a private owner.

Section 742, Title 46, U.S.Code Annotated provides:

*"In cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States or against any corporation mentioned in section 741 of this title, as the case may be, provided that such vessel is employed as a merchant vessel or is a tugboat operated by such corporation. \* \* \* In case the United States or such corporation shall file a libel in rem or in personam in any district, a cross libel in personam may be filed or a set-off claimed against the United States or such corporation with the same force and effect as if the libel had been filed by a private party. \* \* \* "* (Emphasis by the writer.)

No motions for re-hearing, or otherwise to permit counsel for the Government to be heard for the purpose of urging consideration of Berger's testimony or the other evidence offered by East Coast, were made on behalf of the appellant, and I do not believe this court is called upon to "wet nurse" its attorneys. We certainly would not do this for a private litigant.

It is my view that even if the evidence offered by East Coast is considered, the Commissioner and the lower court were amply justified in finding both the facts and the law in favor of the libelant. I think that the judgment appealed from should be affirmed, and therefore respectfully dissent.

On Petition for Rehearing

Before RIVES, Circuit Judge and DAWKINS, District Judge.

PER CURIAM.

 Judge STRUM died without expressing his opinion on this petition for rehearing. Judge RIVES thinks that it should be denied. While Judge DAWKINS remains of the same opinion as expressed in his original dissent, he agrees that under Rule 29 of this Court the petition for rehearing cannot be granted unless a judge who concurred in the judgment desires it and a majority of the Court so determines. The petition for rehearing is therefore denied.

Denied.