BIMINI RUN, LTD., Appellant,

v.

BELCHER OIL COMPANY, Appellee.

No. 20991.

United States Court of Appeals
Fifth Circuit.

July 20, 1964.

Rehearing Denied Sept. 14, 1964.

Cromwell A. Anderson, Murray H. Dubbin, G. Morton Good, Dubbin, Schiff, Berkman & Dubbin, and Smathers & Thompson, Miami, Fla., for appellant.

M. Lewis Hall, Jr., Hall & Hedrick, Miami, Fla., for appellee.

Before RIVES and JONES, Circuit Judges, and BOOTLE, District Judge.

RIVES, Circuit Judge:

The appellant, Bimini Run, Ltd., filed a possessory libel against the M/V CALYPSO LINER, alleging a breach of a bareboat charter by Bimini Run of Bahamas, Ltd., the charterer. The appellee, Belcher Oil Company, intervened, asserting a maritime lien against the vessel for fuel oil supplied from July 26, 1962, to October 15, 1962. After awarding the appellant possession of the vessel, the district court held that the appellee was entitled to the lien. This appeal is from the granting of that lien.

The only question to be decided is whether Belcher Oil Company exercised reasonable diligence to ascertain the existence of the charter and its provisions prohibiting the charterer from incurring liens.

The appellant, Bimini Run, Ltd. (a Liberian corporation), is a wholly-owned subsidiary of Canaveral International Corporation and for all practical purposes is the owner of the M/V CALYPSO LINER. Appellant first began operating the vessel in December 1961, at which time it advised Belcher Oil Company that Belcher would have the fuel oil account for the vessel. On May 31, 1962, appellant chartered the vessel to Bimini Run of Bahamas, Ltd., a Bahamian corporation which is in no way affiliated or connected with Bimini Run, Ltd., or its parent, Canaveral International. This charter contained a provision forbidding the charterer from creating maritime liens except for wages or salvage. On taking over the vessel, the charterer continued to operate it on a similar schedule with many of the same crew members and without change of name. When appellant had been operating the vessel, its fuel oil had been ordered through the ship's husband, or agent; but after the transfer of possession, the fuel was ordered by the first engineer. Two newspaper articles, one on June 11 and the other on June 12, 1962, mentioned the fact that the CALYPSO LINER had been chartered, although the articles were primarily devoted to events which took place at a stockholders' meeting of Canaveral International. There is a dispute as to whether a copy of the charter was posted on the vessel. Belcher Oil's shipping orders were addressed to "M/V Calypso

Liner and Owners," and as such were signed by the personnel on the chartered vessel. Both parties to this appeal rely heavily on the following letter which appellant wrote to Belcher Oil on June 13, 1962:

"CALYPSO LINER
Bimini Run Ltd. Agents
Nassau, Bahamas
Reply to:
Bimini 853 Biscayne Boulevard
Bahamas Miami, Florida
Telephone: 377–2087
"June 13, 1962

"Belcher Oil Co.
P. O. Box 1–1751
Miami, Florida

"Gentlemen:

Re: M/S Calypso Liner
You are hereby advised that all bills incurred prior to June 1, 1962 will be invoiced and mailed to:

Bimini Run Ltd.
P. O. Box 2524
Miami Beach, Florida

as has been the policy.

After June 1, 1962 all bills for any debts on the above named vessel will be invoiced and mailed to:

Bimini Run of Bahamas Ltd.
301-1/2 Lincoln Road Mall
Miami Beach, Florida
Very truly yours,
BIMINI RUN LTD.
/s/ D. S. Dubbin
D. S. DUBBIN
PRESIDENT
DSD/bh

Daily Cruises Miami to Bimini and Return"

The district court found that Belcher Oil was not alerted or notified of the charter or change of possession. Instead, it held that Belcher Oil was misled by the letter from appellant: "This affirmative action of the owner having averted and prevented an investigation by the supplier, the supplier may enforce a maritime lien."[1]

In part, 46 U.S.C. § 973 provides:

"[N]othing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

■ This statute places an affirmative duty on the supplier to inquire and investigate as to the existence of a charter and its terms. The leading authority is United States v. Carver, 1923, 260 U.S. 482, 489, 43 S.Ct. 181, 182, 67 L.Ed. 361, in which Mr. Justice Holmes said:

"We regard these words [of section 973] as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out

---

1. The court found that the letter was misleading in the following respects:
"8. The officers of intervenor further testified and the Court finds that the letter of June 13th was regarded by the company as nothing more than a change of invoice procedure. Thus the invoices were to be sent to a corporation of similar name at a street address, rather than a post office address, on Miami Beach, Florida. The significance of this change in invoicing was minimized by virtue of the fact that Bimini Run, Ltd. was a wholly owned subsidiary of Canaveral International Corp., and D.S. Dubbin was President of both corporations. The similarity of names between the libelant and charterer was misleading to the supplier in this case, who had no control over intercompany procedure as between parent and subsidiary corporations.
"9. In light of the circumstances of this case, including the testimony and exhibits, the effect of this letter was to mislead the supplier and prevent intervenor from making an investigation. Thus, rather than provoking an investigation, the letter averted and prevented one. The result was that the supplier in this instance relied upon the credit

that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms." [2]

The Carver case has been interpreted in Gilmore & Black, Admiralty, 566 (1957) as holding that "the materialman is always charged with notice of the contents of a charter (unless, hypothetically, he can show that even by inquiry he could not have found out about it) even though there is nothing to call his attention to the fact of the charter's existence and he may reasonably suppose that he is dealing with the owner." [3] The net result is that suppliers must always make inquiry, "whether or not they know facts which would lead them to think that the vessel was not owned by the company operating it." [4] Thus, the mere similarity of the crews and schedules and the retention of the name of the vessel would not in themselves relieve Belcher Oil from the duty to inquire.

 As to the letter of June 13, the district court found that it was interpreted as a change of invoice procedure and did not serve to "provoke" an investigation. These findings are not clearly erroneous. The district court, however, went on to hold that the letter "prevented" an investigation so that the supplier was *without cause* to exercise reasonable diligence to ascertain that the engineer who ordered the fuel oil was without authority to bind the vessel." (Emphasis added.) We have already shown that the duty to investigate exists

even where there are no facts which would put the supplier on inquiry. The supplier's duty to inquire was continuous even though there may have been nothing in the letter of June 13 to arouse his suspicions.

The situation here is similar to that in Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 5 Cir. 1956, 237 F.2d 506, reversing Esso Export Corp. v. The Cortes, 136 F.Supp. 506 (S.D.Ala.1955). In that case the supplier wrote to the owner asking him for confirmation of whether the purchaser of supplies would operate the vessel under a bareboat charter and asking for additional information which would assist in making a credit appraisal of the purchaser. The owner replied by a letter which stated that the final contract had not been signed, but that the negotiations would probably be concluded in a few days. The owner added, "If anything develops that might alter this situation, I will be glad to advise you accordingly." [5] No further letters were written. The district court held that the supplier exercised reasonable diligence and that once an inquiry is made, the owner is under an obligation to use diligence in apprising the supplier of any limitations in the charter as to imposing maritime liens. This Court reversed, holding that the exchange of letters was of no real significance and that the supplier's investigation was inadequate as a matter of law— the risk of noninquiry was on the supplier. [6] In the instant case, Belcher Oil could not sit back and treat the owner's letter as absolving it of the obligation to make any future inquiries.

of the vessel without cause to exercise reasonable diligence to ascertain that the engineer who ordered the fuel oil was without authority to bind the vessel."

2. Accord, e. g., Dampskibsselskabet Danneborg v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197; Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 5 Cir. 1956, 237 F.2d 506.

3. "By the Carver and Signal Oil cases the materialman is always charged with notice

of a charter's existence. This proposition seems to be most clearly true where the services are furnished on the order of one who is in fact a charterer or purchaser (even though the materialman may assume him to be the owner)." Gilmore & Black, Admiralty 566 (1957).

4. United States v. Robins Dry Dock & Repair Co., 1 Cir. 1926, 13 F.2d 808, 810.

5. 136 F.Supp. at 507.

6. 237 F.2d at 508.

There is yet another reason why the district court's conclusion was erroneous. No mention was made of the following testimony by Earl Lee Kong, the first engineer aboard the CALYPSO LINER while it was in the possession of the charterer:

"Q. Did you ever at any time have any conversations through the middle of June with any employees of Belcher Oil Company concerning the deliveries of fuel oil?

"A. Yes, sir.

"Q. Would you state the approximate date of any such conversations?

\* \* \* \* \* \*

"A. I wouldn't be able to remember the exact date or dates.

"Q. As well as you can recall?

"A. Yes. One morning one of the drivers came to deliver the fuel.

"Q. Driver of what?

"A. Of the Belcher Oil truck.

"Q. Do you recall his name?

"A. I can't recall his name. He's a short fellow.

"Q. Go ahead. Approximately when was this?

"A. That was sometime in June.

"Q. Do you recall whether it was at the beginning of June or end of June?

"A. No, about coming to the ending of June.

"Q. What was the nature of this conversation, would you please repeat as well as you can recall what was said by him and what was said by you?

"A. Well, we were having a cup of coffee about 6:00 o'clock in the morning so he saw a strange guy who was speaking to me by the name of Jack Hallsberg (phonetic). So, he asked me who is that guy. I told him, 'Well, he is one of the new fellows who start to operate the ship.'

"Q. What did he say to that?

"A. So he said, 'Dubbins [President of Bimini Run, Ltd.] haven't the ship no more?' I say, 'Yes, they are the owners of the ship, *but they chartered it out to these people.*'

"Q. And this was somewhere in the latter part of June?

"A. Yes, Yes." [Emphasis added.]

No evidence to dispute or weaken this testimony was introduced. The fuel oil involved in this litigation was furnished on and after July 26, subsequent to the above notice to Belcher Oil's driver.[7] Of course, it might be argued that notice to the driver would not be notice to his employer. Section 275 of the Restatement (Second), Agency (1958) states:

"Except where the agent is acting adversely to the principal or where knowledge as distinguished from reason to know is important, the principal is affected by the knowledge which an agent has a *duty to disclose* to the principal or to another agent of the principal to the same extent as if the principal had the information." (Emphasis added.)

In United States v. Daniels Towing & Drydock, 5 Cir. 1954, 214 F.2d 501, 502, this Court held that the knowledge obtained by a Captain and crew of the markings of barges in tow served as notice to their employer, a towing company. Since the duty to investigate requires a supplier to make inquiries even when he has no reason to suspect a charter, reasonable diligence to investigate would surely include placing a duty on his employees to disclose knowledge that a purchaser is now operating under a charter. The employees making deliveries are the ones in closest contact with the vessels and might often detect otherwise unknown changes in possession. If, therefore, the driver had a duty to report his knowledge of the charter to his employer, his knowledge would serve as notice to Belcher Oil of the charter's existence. However, if Belcher Oil did

---

7. The district court's opinion is in error when it states that the fuel was furnished beginning June 26 instead of July 26. (R. 81, 88, 106; Intervenor's Ex. 1.)

 

not place on its drivers a duty to disclose such information, then it failed to exercise reasonable diligence to discover the existence of the charter.

The judgment of the district court is reversed and the cause remanded.

Reversed and remanded.