443 F.2d 1144
 ESSO INTERNATIONAL, INC., Plaintiff-Appellee-Cross Appellant,
v.
The SS CAPTAIN JOHN, her Engines, etc., Defendant, Bright
Star Steamship Company, Inc.,
Defendant-Appellant-Cross Appellee.
 No. 30133.
 United States Court of Appeals, Fifth Circuit.
 May 26, 1971.
 
 Robert Eikel, Eikel & Goller, Houston, Tex., for defendants,-appellant, appellee Bright Star Steamship Co., Inc.
 Jack L. Allbritton, E. V. Greenwood, Houston, Tex., for Esso International, Inc., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.
 Before SKELTON,* Judge, and MORGAN and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 This admiralty action concerns the propriety of the imposition of in rem and in personam liability against the vessel SS CAPTAIN JOHN and its owner, Bright Star Steamship Co., Inc. (Bright Star), in favor of Esso International, Inc. (Esso), a supplier of marine fuels and lubricants. The issues in this appeal are:
 
 
 2
 a) Did Bright Star authorize J. S. Gissel & Co. (Gissel & Co.) to bind it to pay for marine fuels and lubricants furnished to the CAPTAIN JOHN and to impose maritime liens on the ship?
 
 
 3
 b) If Bright Star gave no such authorization to Gissel & Co., did it ratify Esso's contracts?
 
 
 4
 c) Did a preferred ship mortgage on the CAPTAIN JOHN containing a clause prohibiting the creation of liens preclude the imposition of Esso's alleged maritime lien?
 
 
 5
 d) Was Esso guilty of laches in failing to timely assert its lien claims?
 
 
 6
 e) Did Esso waive its in rem and in personam rights against the CAPTAIN JOHN and Bright Star by accepting 20% Of the amount due in bankruptcy proceedings against Gissel & Co.?
 
 
 7
 f) Did the district court abuse its discretion in refusing to award Esso pre-judgment interest on its damages?
 
 
 8
 (The district court, D.C., 322 F.Supp. 314, resolved all issues in favor of Esso except f.)
 
 
 9
 The identity and interest of the various entities involved are as follows. Bright Star was incorporated in the 1940's by Captains Theocharidis and Couvielos and is still wholly owned by these men. The only ship operated by Bright Star at all relevant times was the SS CAPTAIN JOHN. Collin & Gissel was an assumed trade name for a sole proprietorship wholly owned by Julius Gissel, whose brother, Lewis Gissel, acted as his office manager. Julius Gissel used this name to engage in the steamship agency business, and Bright Star was among his clients. Julius Gissel was the principal stockholder and president of the Gissel & Co. corporation, and Lewis Gissel was its vice president and office manager. This corporation operated tug boats and barges. Esso, a dealer in marine petroleum products, entered into the subject fuel and lubricant contracts with Gissel & Co. These contracts were assigned by Esso to Humble Oil & Refining Co. (Humble), who actually supplied the fuels and lubricants. Humble, in turn, reassigned the invoices to Esso for collection. Esso sued for the uncollected amounts due for the fuels and lubricants so supplied.
 
 
 10
 In 1946 Bright Star entered into a continuing letter agreement with Collin & Gissel whereby Collin & Gissel was to contract for fuels and lubricants for Bright Star, to pay Bright Star's accounts as they came due, and to collect its freight receivables. It was also understood that Bright Star was to supply Collin & Gissel with any funds necessary should the freight receipts be insufficient to pay the accounts. All fuels and lubricants required by Bright Star were purchased directly by Collin & Gissel from Esso until 1964. Julius Gissel then persuaded Bright Star to purchase its requirements through Gissel & Co. Lewis Gissel, the officer manager for both Gissel businesses but acting at the time through Gissel & Co., contracted with Esso for the purchase of fuels and lubricants. Separate written contracts were drawn (on Esso's printed forms) for these products. The blank for the name of the buyer in the heading of the fuels contract was filled in with the name of Gissel & Co. together with these added words: 'including the requirements of Bright Star Steamship Company, Inc.'. This contract further provided that it covered only vessels 'owned, operated, chartered, or controlled by Buyer'. In slightly different verbage, the top of the lubricants contract specified the buyer was Gissel & Co., 'including Bright Star Steamship Company, Inc.', and provided Esso was obligated under it 'only so long as that vessel is owned or operated by Buyer.' The buyer designation was made as it was because Esso was under the mistaken impression that Gissel & Co. was the operating manager of the vessel instead of Bright Star. It is undisputed that the intended procedure was for Bright Star to pay Collin & Gissel any temporary deficits in operating funds and for the latter to pay Gissel & Co. any amounts that might be owing on accounts such as Esso's. This controversy between Esso and Bright Star arose when Gissel & Co. failed to pay Esso and was adjudicated a bankrupt. The question is-- who loses the amounts washed out in the bankruptcy?
 
 
 11
 The answer to the question both as it concerns Bright Star's liability in personam and the liability of the CAPTAIN JOHN in rem turns upon the authorization of Gissel & Co. to impose maritime liens on the vessel and to bind Bright Star to contracts for fuels and lubricants.
 
 
 12
 Testing the in personam liability of Bright Star obviously involves the use of common principles of agency authority. Under the pertinent statute any person who furnishes necessaries such as fuels and lubricants to a vessel, is entitled to a maritime lien on her if the necessaries were ordered by the owner of the vessel, or by a person authorized by the owner.[1] Thus, in determining in rem liability, we must also look to the law of agency, which requires that we assay the relevant facts from which the presence or absence of authorization is to be adduced.
 
 
 13
 This law tells us there are two species of authority; actual, either express or implied, and apparent. See Restatement (Second) of Agency 7-8 (1958); 3 Am.Jur.2d Agency 18-19 (1962); 2 C.J.S. Agency 91 c. (2), 96 (1936). 'An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties.' 3 Am.Jur.2d Agency 18 (1962).
 
 
 14
 At the core of Bright Star's first two contentions is the difference in legal entity of the two Gissel businesses. It reasons that Gissel & Co. was the only party to the contracts with Esso, and that Bright Star had authorized only Collin & Gissel, who was repurchasing from Gissel & Co., to bind it. Thus, Bright Star argues, because it was not a party to the contract and Gissel & Co. had no authority to bind it to one, it cannot be personally liable on that contract and, in addition, no maritime lien can validly be imposed upon the CAPTAIN JOHN. However, the following colloquy between the court and Captain Couvielos, though later qualified and explained, furnished ample evidence to support the finding that Julius Gissel, the sole owner of Collin & Gissel and the principal stockholder of Gissel & Co., was granted express authority to purchase these supplies for Bright Star.
 
 
 15
 'Q When you bought this last CAPTAIN JOHN that you had operating in 1964, what arrangements did you make to have a contract to protect yourself like you have testified here, to get the fuel for that vessel? What arrangement did you make?
 
 
 16
 'A We were with Collin and Gissel, Lewis Gissel, who was managing the company, to arrange a direct oil contract with the Humble Oil Company, as we call it here in Houston, or the Esso International. In the meantime, next day or a couple of days later, and we had been in the office again in a little room, and Julius Gissel came in. That was myself, Captain John Theocharidis and Lewis Gissel, then Julius Gissel came to our office with Lewis Gissel who had another office in the same building, but far away from ours.
 
 
 17
 He closed the door and said, 'Gentlemen, I'd like to tell you this: I have established a tremendous business over here with the Humble Oil Company and it will be of great help to me if you allow me to buy-- to furnish all the needs of bunkers to the CAPTAIN JOHN through my company, through J. S. Gissel.'
 
 
 18
 Then we told Julius we had of course relations for many, many years of knowing him. We tell him, Julius, we don't have any objection for you to do that, providing of course that we are not going to have overcharge or providing we are going to have competitive prices with the other companies.
 
 
 19
 He say, 'Don't worry about that. This is going to be a great deal even for you, because sometimes a vessel goes to ports where it's short of oils or many ships waiting for oil, and very much over here, and I'm with the Humble and through my-- how can I say-- influence or something like that, you are going to have better services.'
 
 
 20
 So we accept. We say, 'You go ahead and do it.'
 
 
 21
 'Q So you don't deny Gissel and Company or even Collin and Gissel had authority to make arrangements to purchase the fuel for the CAPTAIN JOHN, do you?
 
 
 22
 'A They had the authority to do that, yes, sir.'
 
 
 23
 Bright Star's insistence that it acted through Lewis Gissel only as manager of Collin & Gissel rather than as manager of Gissel & Co., will not suffice to avoid the consequences of their joint and common dealings. Since it is clear that Collins & Gissel and Gissel & Co. were no more than the alter egoes of Julius Gissel, and that Bright Star expressly conferred upon Julius Gissel the requisite authority to make these purchases, we could not say that an admiralty court erred in refusing to recognize the minuscule distinction between Lewis Gissel, agent for his brother, and Lewis Gissel, agent for the almost identical entity Gissel & Co.
 
 
 24
 The Court's determination of such authority in Gissel & Co. is supportable on another ground. The inferences and deductions from the conduct of and the relationship between Bright Star and Julius Gissel, establish beyond cavil that Julius Gissel was clothed with the implied authority to bind Bright Star for these fuels and lubricants. Subsequent to the agency contract between Bright Star and Collin & Gissel, Bright Star was furnished office space in the same building with Collin & Gissel and Gissel & Co. Collin & Gissel and Gissel & Co. operated out of the same office, they used the same phone number and, insofar as the public was concerned, Lewis Gissel was in charge of the day to day operation of both companies. All of the invoices received for the supplies in suit went directly to Captain Couvielos for his verification. These invoices were addressed to 'SS CAPTAIN JOHN and owners, c/o J. S. Gissel & Co.' Thus, in the close knit relationship presented here, Bright Star knew or should have known of the nature of the arrangements made by Gissel & Co., the circumstances surrounding those arrangements, and that Esso was ultimately looking to it for payment. Bright Star most assuredly acquiesced in, if it did not expressly approve, this course of conduct by Gissel & Co. with Esso. Knowledge of, and acquiescence in, the agent's acts can be enough to establish implied authority if it manifests the principal's consent to the agent's acts. 2 C.J.S. Agency 99 c. The test in this regard is whether the agent may reasonably draw an inference that the principal intended him so to act. In view of the testimony above quoted and the factual situation existing between the parties, it is evident that Julius Gissel could reasonably have concluded that he was authorized to act. Restatement (Second) of Agency 7 (1958).
 
 
 25
 Bright Star attempts to bolster its position in two ways. First, it states that the evidence shows that Gissel & Co. made use of part of the supplies furnished under the contracts, a fact disputed by Esso. Bright Star argues that this tends to establish its claim that it was engaging in completely separate business transactions when repurchasing through Collin & Gissel from Gissel & Co. and that Gissel & Co. was more than a mere conduit. However, whether Gissel & Co. was utilizing some part of the fuels and lubricants is irrelevant to the question of implied authority. If Gissel & Co. had been a dealer or distributor of marine supplies and products, then certainly a different case would be presented, but the situation here is far more consistent with an agency arrangement than it is with independent contractor status. Second, Bright Star contends that Esso knew that Gissel & Co. had no authority to bind Bright Star, or, if Esso was under the mistaken impression that Gissel & Co. was the operating manager of the SS CAPTAIN JOHN, it could have found out to the contrary if it just had taken the pains to inquire. This second argument is also unpersuasive. It assumes that no authority ever existed, but the evidence was sufficient to demonstrate both express and implied authority. Moreover, what Esso knew or should have known is irrelevant when one is attempting to establish an implied agency. It is the manifestations of the alleged principal and agent as between themselves that is decisive and not the appearances to a third party or what that third party should have known. Restatement (Second) of Agency 7 (1958); 2 C.J.S. Agency 99 c.[2]
 
 
 26
 Bright Star attempts to defeat the imposition of a maritime lien by pointing to a prohibition-against-liens clause in a preferred ship mortgage, which was being carried aboard the CAPTAIN JOHN at all relevant times. This clause prohibited the creation of any liens against the vessel by anyone. Bright Star relies upon 46 U.S.C.A. 973 (1958), herein quoted in pertinent part.
 
 
 27
 'But nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.'
 
 
 28
 In essence, Bright Star contends that the clause 'or for any other reason' includes a preferred ship mortgage. This in turn would mean that an owner of a vessel or his agent could not, under the circumstances of this case, incur any additional liens on the vessel once the mortgage has been executed, and the supplier would be under a duty of exercising reasonable diligence to ascertain that fact. Bright Star cites the cases set out in the margin as supporting its proposition that Esso had a duty of reasonable diligence to discover whether Bright Star or its agent had authority to incur additional liens.[3]
 
 
 29
 We assume that had Esso exercised reasonable diligence, it could have discovered the existence of the preferred ship mortgage. The question then boils down to whether or not a mortgage of this type with its prohibition-against-liens clause precludes an owner, or his agent, from creating additional liens against his own vessel. We hold that it does not. The cases cited by Bright Star to support its position are all charter party cases, and therein lies the fundamental distinction between the contention pressed by Bright Star and the case at bar. In the charter party cases, an owner of a vessel is seeking to prevent the charterer from encroaching upon his ownership or equity interest by the imposition of liens in contravention of that owner's wishes. Thus a supplier to a charterer must exercise reasonable diligence to ascertain the existence of the charter party and its prohibition-against-liens clause. An absolute prohibition against additional liens may be created in a charter party, and any supplier who proceeds without the exercise of reasonable diligence to discover such a proviso does so at his peril.
 
 
 30
 The case at bar presents a different situation. Here, the mortgagee who contracted for such a clause obviously did so to protect its prior lien position by precluding the owner, Bright Star, from incurring liens prior in right to that of the ship mortgage. Such a mortgagee would have no reason to bar an owner from establishing any liens which did not effect its own because if they could not affect the equity available to satisfy the mortgage, their presence would be immaterial to the mortgagee. Indeed, such items as are lienable would frequently protect the prime security by enhancing the value of the vessel. The distinction between an owner vis a vis a charterer and an ownermortgagee relationship, in the application of 973, has been accorded judicial imprimatur in Atlantic Steamer Supply Co. v. The Tradewind, 144 F.Supp. 408 (D.Md.1956), which has been cited with approval in our recent holding in State of Israel v. Motor Vessel Nili, 435 F.2d 242 (5th Cir. 1970). See also Rockport Yacht & Supply Co. v. M/V Contessa, 209 F.Supp. 396 (S.D.Tex.1962). We find Tradewind's reasoning persuasive as to the issue before us. We hold that a lien prohibition clause in a ship mortgage does not reach below its own limits to bar the owner and his authorized agents from creating binding and valid liens on the owner's remaining equity. Thus, reasonable diligence under 973 becomes irrelevant. Bright Star had the ability to create a lien on its vessel and, acting through its authorized agents, did create a lien on its vessel in favor of Esso but subordinate to the preferred ship mortgage.[4]
 
 
 31
 Bright Star argues that whatever lien rights Esso possessed were barred by laches due to Esso's prejudicial delays in pressing for payment on the invoices. The eight invoices in question were variously dated from August 27 to November 30, 1964 and contained provisions requiring payment within 30 days from their dates. Esso made no demand on Bright Star for payment (other than that made by delivery of the invoices which were verified by Bright Star) until December 17, two days after Gissel & Co. had declared bankruptcy. At all times prior to the bankruptcy, Bright Star had supplied ample funds to Collin & Gissel to pay Gissel & Co. for all outstanding Esso invoices. In fact, on December 31 Collin & Gissel owed Bright Star 72,851.70 dollars. The district court found that Collin & Gissel was using Bright Star's funds for purposes other than paying Esso's bills and held that the filling of suit by Esso on February 5, 1965 precluded any bar to the liens by reason of laches. Bright Star contends this conclusion is error because the time of the filing of suit is irrelevant to the operation of the doctrine of laches in this case.
 
 
 32
 Bright Star asserts Humble (and thus Esso, derivatively as assignee) knew for many months prior to the bankruptcy that Gissel & Co. was in financial trouble. It contends that, knowing this fact, Esso should have pressed its claims against Bright Star when the invoices were not paid within the 30 days allowed. It reasons that if Esso had done so, it would have forced Collin & Gissel to pay Esso and thus could have prevented any funds that did from winding up in the hands of Gissel & Co. Esso counters by pointing out that any prejudicial harm suffered by Bright Star was due to its own negligence in failing to inquire into the reason why Collin & Gissel was requesting such large sums from it. The evidence shows that Bright Star never made any inquiries as to whether or not Collin & Gissel was properly paying its bills, yet a comparison of invoices to the funds advanced would have shown something was greatly amiss. Thus Esso urges that the harm befell because the agent who Bright Star entrusted with its funds proved unworthy of that trust, and Bright Star must bear the loss.
 
 
 33
 Laches requires the showing of something more than a delay in time-- that something more is prejudicial harm. Prejudicial harm does not occur merely because one loses what he otherwise would have kept. He who would invoke laches must show a delay which has subjected him to a disadvantage in asserting and establishing his claimed right or defense. Point Landing Inc. v. Alabama Dry Dock & Shipbuilding Co., 261 F.2d 861 (5th Cir. 1958). See also Molnar v. Gulfcoast Transit Co., 371 F.2d 639 (5th Cir. 1967); M. Norris, The Law of Seaman 455 (3d ed. 1970). The existence of laches is a question of fact to be decided by the court after weighing the equities as they appear from the facts of each case. McDaniel v. Gulf & South American Steamship Co.,228 F.2d 189 (5th Cir. 1955). The district court decided that laches did not bar Esso's claims and we cannot say this finding was clearly erroneous.
 
 
 34
 Out of Gissel & Co.'s bankruptcy proceedings, Esso received 20% Of the amount due on the invoices. In attempting to defeat its in personam judgment liability, Bright Star argues that this action by Esso clearly indicates that Esso was looking only to Gissel & Co. for payment and that this amounts to a reaffirmation by Esso that its contract was with Gissel & Co. only. The quoted protions of the contracts, at best, ambiguously indicate that Bright Starwas a co-obligor on the contract. In the face of cross-contentions as to what such words meant, we look to the subsequent action of the parties in interpreting the questioned language. Restatement of Contracts 235(e) (1932). Most important is the fact that all invoices were addressed to Bright Star. Although Bright Star verified these invoices, it never voiced a complaint about this form of billing. We conclude the district court was correct in holding there was no merit to Bright Star's contention it was not jointly liable with Gissel & Co. The Bankruptcy Act, 11 U.S.C.A. 34, unequivocally states that 'the liability of a person who is a co-debtor with, or a guarantor, or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt.' See also 1 Collier on Bankruptcy P16.02, 16.08 (14th ed. 1970). Thus we conclude that Bright Star's in personam liability was not discharged by the bankruptcy proceedings of Gissel & Co.
 
 
 35
 In its opinion, 322 F.Supp. 314, the district court stated, 'Under the circumstances of this case, I refuse to grant any interest to the plaintiff other than from the date of entry of judgment herein.' It is of course a general rule of admiralty that interest on damages should be allowed uniformly from the date of the loss, unless for good reasons it is determined otherwise. American Zinc Co., et al. v. Jacob A. Foster, et al.,441 F.2d 1100 (5th Cir. 1971) (No. 29890, May 10, 1971). Geotechnical Corp. of Delaware v. Pure Oil Co., 214 F.2d 476 (5th Cir. 1954); Harris v. Sabine Transp. Co., 202 F.2d 537 (5th Cir. 1953). But it is also a well-settled admiralty rule that the allowance of prejudgment interest is committed to the sound discretion of the trial court. Chagois v. Lykes Bros. Steamship Co.,432 F.2d 388 (5th Cir. 1970); Haynes v. Rederi A/S Aladdin, 362 F.2d 345 (5th Cir. 1966). Although the district court failed to state any reasons for its decision, we deem it unnecessary to remand for specific findings on this issue since the record clearly discloses several considerations which could have moved the district judge to exercise his discretion as he did. First of all, five years interest is involved. While we cannot account for every reason why the trial of this case did not occur for some five years after the libel was filed, a partial explanation lies in the fact that Esso was pursuing its remedy in the bankruptcy proceeding during a part of the pendency of this suit. Secondly, Esso could have taken the full amount of its claim in the bankruptcy in the form of a note but chose not to pursue that remedy. Had it done so, there would have been no recourse against Bright Star and thus no interest involved. Finally, the district court would have been entitled to take into consideration the fact that Esso, with knowledge of Gissel & Co.'s financial difficulty, failed to press for prompt payment of its invoices. With these factors in the cause, we cannot find abuse of discretion on the part of the district court in refusing to award pre-judgment interest.
 
 
 36
 The judgment of the district court is in all respects.
 
 
 37
 Affirmed.
 
 
 
 *
 Hon. Byron G. Skelton, U.S. Court of Claims, sitting by designation
 
 
 [1]
 46 U.S.C.A. 971 (1958)
 
 
 [2]
 From the explicated facts, apparent authority might also be indicated, but since it is unnecessary to our holding here and since it is at least arguable that apparent authority is not the kind of authority under 971 that would defeat the strictures of 973, quoted in the text, infra, we pretermit any ruling on this issue. We also pretermit as unnecessary any ruling upon whether the finding of the district court that Bright Star ratified the acts of Gissel & Co. would pass the clearly erroneous test
 
 
 [3]
 United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923); Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940); Ajubita v. S/S PEIK, 428 F.2d 1345 (5th Cir. 1970); Bimini Run, Ltd. v. Belcher Oil Co., 336 F.2d 184 (5th Cir. 1964); Tampa Ship Repair and Dry Dock Co. v. Esso Export Corp., 237 F.2d 506 (5th Cir. 1956); The Western Wave, 77 F.2d 695 (5th Cir. 1935)
 
 
 [4]
 We emphasize, however, that under no circumstances may such additional liens, either singularly or in their cumulative impact, prime or impair the full vitality of a prior preferred ship mortgage. As between those who assert these equity liens and the preferred ship mortgagee, the clause proscribing other liens remains fully effective